# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
April 10, 2014 Session Heard at McKenzie[1]

## CLARENCE NESBIT v. STATE OF TENNESSEE

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. P21818    Chris Craft, Judge**

---

**No. W2009-02101-SC-R11-PD - Filed November 14, 2014**

---

The issue presented is whether the defendant is entitled to a new trial based on ineffective assistance of counsel. A Shelby County jury convicted the defendant of first degree premeditated murder and sentenced him to death. Following unsuccessful appeals, the defendant filed for post-conviction relief on the grounds of ineffective assistance of counsel. The post-conviction court granted the defendant a new sentencing hearing, but denied him a new trial on the murder conviction. A majority of the Court of Criminal Appeals affirmed, holding that any deficiency in trial counsel's performance at the guilt phase did not result in prejudice. We hold that the defendant has not proven by clear and convincing evidence a reasonable probability that, but for the deficient performance of his trial counsel, the result would have been different. We affirm the judgment of the Court of Criminal Appeals and remand the case to the trial court for a new sentencing hearing.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Affirmed; Case Remanded to the Trial Court**

SHARON G. LEE, C.J., delivered the opinion of the Court, in which JANICE M. HOLDER, CORNELIA A. CLARK, GARY R. WADE, and WILLIAM C. KOCH, JR., JJ., joined.

Marty B. McAfee and Gerald Skahan, Memphis, Tennessee, for the appellant, Clarence Nesbit.

---

[1] Oral argument was heard on April 10, 2014, at Bethel University in McKenzie, Tennessee, as a part of the Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

Robert E. Cooper, Jr., Attorney General and Reporter; Gordon W. Smith, Associate Solicitor General; James E. Gaylord, Assistant Attorney General; Amy P. Weirich, District Attorney General; and John Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.**

On the afternoon of May 20, 1993, nineteen-year-old Clarence Nesbit ("the Defendant") shot and killed twenty-year-old Miriam Cannon ("the victim") in her apartment in Memphis. The Defendant and the victim, who had known each other for about a month, had a romantic relationship. The Defendant was arrested and charged with first degree murder. In 1995, a Shelby County jury convicted him of first degree murder and sentenced him to death. His conviction and sentence were affirmed on appeal. *State v. Nesbit*, 978 S.W.2d 872, 877 (Tenn. 1998); *State v. Nesbit*, No. 02C01-9510-CR-00293, 1997 WL 194864, at *21 (Tenn. Crim. App. Apr. 22, 1997).

In 1999, the Defendant timely filed a petition for post-conviction relief. He subsequently amended and supplemented the petition. The Defendant asserted that his trial counsel had provided ineffective assistance by failing to adequately investigate, prepare, and present certain evidence at trial and by failing to timely convey to him a plea offer. Between May 19, 2003, and December 19, 2006, the post-conviction court conducted evidentiary hearings. By order entered September 9, 2009, the post-conviction court ruled that the Defendant was not entitled to post-conviction relief as to the murder conviction, but was entitled to a new sentencing hearing based on ineffective assistance of counsel. Both parties appealed; the State dismissed its appeal.

A majority of the Court of Criminal Appeals affirmed the post-conviction court's decision. *Nesbit v. State*, No. W2009-02101-CCA-R3-PD, 2013 WL 1282326, at *63 (Tenn. Crim. App. Mar. 28, 2013). Judge Joseph M. Tipton dissented, expressing the view that trial counsel's deficient investigation and trial preparation were prejudicial and warranted a new trial. *Id.* at *64-68 (Tipton, P.J., dissenting). We granted the Defendant's application for permission to appeal.

## II.

### A.

The Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101 to -122 (2012), provides that relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States," *id.* § 40-30-103. A claim of ineffective assistance of counsel is a mixed question of law and fact. *Calvert v. State*, 342 S.W.3d 477, 485 (Tenn. 2011) (citing *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009); *State v. Honeycutt*, 54 S.W.3d 762, 766 (Tenn. 2001)). A defendant seeking post-conviction relief has the burden of proving his or her factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); *see also Calvert*, 342 S.W.3d at 485 (citing *Grindstaff*, 297 S.W.3d at 216). The factual findings of a post-conviction court are conclusive on appeal unless the record preponderates against them. Tenn. R. App. P. 13(d); *Mobley v. State*, 397 S.W.3d 70, 80 (Tenn. 2013) (citing *Dellinger v. State*, 279 S.W.3d 282, 294 (Tenn. 2009); *Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006)). However, appellate review of a post-conviction court's conclusions of law is de novo with no presumption of correctness. *Mobley*, 397 S.W.3d at 80; *Smith v. State*, 357 S.W.3d 322, 336 (Tenn. 2011) (citing *Calvert*, 342 S.W.3d at 485)).

Both the United States Constitution and Tennessee Constitution provide for the assistance of counsel to criminal defendants. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. These constitutional provisions guarantee not simply the assistance of counsel, but rather the reasonably effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Baxter v. Rose*, 523 S.W.2d 930, 934-36 (Tenn. 1975). Counsel's representation is constitutionally ineffective when it "so undermine[s] the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

In order to prevail on a claim of ineffective assistance of counsel, a defendant must establish both (1) that counsel's performance was deficient and (2) that such deficient performance prejudiced the defense. *Id.* at 687; *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996). Thus, to prevail on a claim of ineffective assistance of counsel, a defendant must prove both deficient performance and prejudice, and a court need not address both concepts if the defendant fails to demonstrate either prong sufficiently. *Strickland*, 466 U.S. at 687; *Goad*, 938 S.W.2d at 370.

Establishing deficient performance requires "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the

Sixth Amendment." *Strickland*, 466 U.S. at 687; *Mobley*, 397 S.W.3d at 80. "Effective" counsel means the provision of advice or services is "within the range of competence demanded of attorneys in criminal cases." *Baxter*, 523 S.W.2d at 936 (quoting *McMann v. Richardson*, 397 U.S. 759 (1970); *see also Strickland*, 466 U.S. at 687 ("[T]he proper standard for attorney performance is that of reasonably effective assistance."). The reasonableness standard is an objective one, measured by the professional norms prevailing at the time of the representation. *Strickland*, 466 U.S. at 678-88; *Dean v. State*, 59 S.W.3d 663, 667 (Tenn. 2001).

Proof of prejudice sufficient to establish constitutionally ineffective counsel is met by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Goad*, 938 S.W.2d at 370. When examining a conviction that occurred as a result of a trial, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. A reasonable probability of being found guilty of a lesser charge also satisfies the prejudice prong of *Strickland*. *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008).

The *Strickland* standard for determining whether a defendant received effective assistance of counsel applies during plea negotiations as well as during trial. *Missouri v. Frye*, 132 S. Ct. 1399, 1407-09 (2012); *see also Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985). Accordingly, during the plea bargain process, as at all critical stages of the criminal process, counsel has the responsibility to render effective assistance as required by the Sixth Amendment. *Frye*, 132 S. Ct. at 1407-08; *Harris v. State*, 875 S.W.2d 662, 663, 665 (Tenn. 1994). "[A]s a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Frye*, 132 S. Ct. at 1408. A fair trial does not correct trial counsel's deficient performance in failing to convey a plea offer because of "the reality that criminal justice today is for the most part a system of pleas, not a system of trials." *Lafler v. Cooper*, 132 S. Ct. 1376, 1381 (2012); *accord Bush v. State*, 428 S.W.3d , 20 (Tenn. 2014) (citing *Frye*, 132 S. Ct. at 1407; *Wlodarz v. State*, 361 S.W.3d 490, 503-04 (Tenn. 2012)).

In reviewing trial counsel's performance, appellate courts must not use "20-20 hindsight." *Mobley*, 397 S.W.3d at 80 (citing *Felts v. State*, 354 S.W.3d 266, 277 (Tenn. 2011)). Instead, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *accord Goad*, 938 S.W.2d at 369. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the

-4-

exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690; *see also State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999) ("[A] reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."). "[T]he burden to 'show that counsel's performance was deficient' rests squarely on the defendant." *Burt v. Titlow*, 134 S. Ct. 10, 17 (2013) (quoting *Strickland*, 466 U.S. at 687).

With these principles in mind, we have carefully reviewed the evidence from the Defendant's post-conviction hearing. We find that the Defendant failed to prove by clear and convincing evidence a reasonable probability that, but for his trial counsel's deficiencies, the outcome of the trial would have been different. Thus, the Defendant is not entitled to relief.

**B.**

According to the proof at the Defendant's murder trial, the Defendant had known the victim for about a month before her death.[2] She lived with her five young children at the Pershing Park Apartments in Memphis. Around 1:00 p.m. on May 20, 1993, the victim's sister, Constance Cannon, and a friend went to the victim's apartment to take the victim to the grocery store. Ms. Cannon knocked on the door, but no one answered. As they were leaving, Ms. Cannon's friend noticed one of the victim's children looking out of the window. Ms. Cannon returned to the apartment, and the victim opened the door to speak with her but did not invite Ms. Cannon to come in, which was unusual. The victim asked Ms. Cannon to come back at 3:00 p.m. Ms. Cannon saw that the victim was barefoot, had a horizontal mark on her neck that Ms. Cannon had not seen the day before, and was fully clothed. Ms. Cannon also noticed the Defendant, whom she had seen once before and knew by the nickname "Red," sitting on the living room couch with one of the victim's children. Ms. Cannon left and later telephoned the victim around 3:00 p.m. to confirm their plans. When Ms. Cannon received no answer, she assumed the victim had made other arrangements, and she did not return to the victim's apartment.

James Shaw, a boyfriend of the Defendant's aunt, Cynthia Nesbit, lived in the victim's apartment complex. On the afternoon of the shooting, as Mr. Shaw was sitting outside his apartment, he heard a gunshot in a nearby apartment. Shortly afterward, he saw the Defendant leave the area from which the gunshot had sounded, casually walk to his car, and drive away. Mr. Shaw described the Defendant's behavior as normal, except for the "funny look" he observed in the Defendant's eyes. Shortly after the Defendant left, Mr. Shaw saw the victim's children crying in the parking lot. When he asked about their mother, one of the children said she was dead.

---

[2] These facts are taken from this Court's opinion in *State v. Nesbit*, 978 S.W.2d 872 (Tenn. 1998).

Tracey Davis, the victim's close friend and neighbor, testified that on the day of the murder, she heard the victim's children crying in their apartment and later saw three of them walking toward her apartment. The children told her that their mother was asleep and they could not wake her. Ms. Davis went to the victim's apartment, found her dead body in the kitchen, and called the police.

When the police arrived, the victim's children explained that "Red" had shot their mother. The police found the victim lying face up, fully clothed, with sandals on her feet. Next to her body, the police found a cigarette butt, a match, a book of matches, and a hair barrette. They also found four bullet cartridges on top of the refrigerator and a lead bullet fragment on the kitchen floor at the door to the living room. A ricochet mark made by a bullet was found approximately four feet eight inches above the floor on the wall behind the stove. A hot curling iron lay on the kitchen counter.

After the shooting, the Defendant drove to the Royal Oaks Motel where his uncle, Ashley Nesbit, was staying. In the bathroom of his uncle's motel room, the Defendant hid the .357 Magnum revolver used in the shooting. Later that day, he returned to the Pershing Park Apartments and talked to Mr. Shaw. The Defendant first told Mr. Shaw that the victim had shot herself while playing Russian roulette, but later told Mr. Shaw that he had accidentally shot the victim. The Defendant also told Mr. Shaw that he had hidden the gun in his uncle's motel room. As Mr. Shaw and the Defendant were preparing to go retrieve the gun, the police stopped their vehicle and apprehended the Defendant. With police permission, Mr. Shaw went to the motel, retrieved the gun, and surrendered it to the police. When questioned by the police, the Defendant explained that he had spent the night before the murder at the victim's apartment. He first said that the victim had been "playing" with the gun when it discharged and killed her, but later said he accidentally shot her. He claimed that he pulled the trigger believing the gun to be unloaded. When asked at trial how he came to have the gun, he testified that he had been visiting his uncle at his motel room when police officers arrived the night before the shooting . The Defendant testified that he removed the gun from his uncle's room and placed it under the seat of his car.

The Defendant testified that he arrived at the victim's apartment at approximately 3:00 a.m., carried the gun inside, removed the bullets, and placed the gun and the bullets on top of the refrigerator. He said that he slept on the victim's living room couch and awoke around 10:00 a.m. The Defendant further stated that he and the victim talked until her sister arrived at 1:00 p.m., and he heard the victim tell her sister to come back at 3:00 p.m. He was preparing to leave in anticipation of the victim's sister's arrival when the shooting occurred. He testified that he retrieved the gun from the top of the refrigerator and was holding the gun while looking out the kitchen window. As he turned away from the window, he held the gun in both hands and pointed it sideways to his left. He stated that, as he

"fumbled" with the gun, it accidentally discharged and a bullet struck the victim. He left the apartment without calling for emergency assistance and knowing that he was leaving the victim's young children in an apartment with their mother's dead body. He denied inflicting burns or other injuries to the victim.

Dr. O.C. Smith, the assistant medical examiner for Shelby County who performed an autopsy of the victim, testified that the victim died from a single gunshot wound to her head. The gun that inflicted the fatal wound had been held approximately twelve to thirty-six inches from the victim's head when it was fired. The bullet entered the victim's body through her left ear— about five feet above the floor—traveled in a downward trajectory through the victim's skull and brain, and exited behind her right ear at a height of four feet eleven inches above the floor. The gunshot wound would have instantly incapacitated the victim. Dr. Smith found no defensive wounds on the victim's body and no signs of sexual assault or activity.

Dr. Smith observed burns on the victim's chin, neck, abdomen, and forearm. The burns had been inflicted at various times, from six hours to mere minutes before the victim had died. The burns ranged from severe first-degree to second-degree burns, comparable to severe sunburns or scald burns caused by touching something hot. One of the burns, on the left side of the victim's neck, was in the shape of the numeral one ("1"). Another triangular burn under the victim's chin appeared to have been caused by an open flame. Other marks, which appeared thermal in origin, could not be precisely identified. According to Dr. Smith, the victim would have suffered moderate pain from the individual burns. The victim also had bruising and scraping on the soles of her feet. Dr. Smith testified that the bruising and scraping were caused by someone striking the victim's feet with a long, hard, thin object, such as a rod or a coat hanger, and were consistent with a relatively rare type of torture called "falanga." While none of these injuries was severe enough to require hospitalization, according to Dr. Smith, the amount of force necessary to cause such bruising would inflict great pain. In his opinion, the victim would have suffered a great deal of distress because the injuries had been inflicted over an extended period of time. There were no marks found on the victim's body indicating that she had been restrained, but Dr. Smith noted that soft ligatures would not have left marks and the victim could have been restrained by mental intimidation.

At the post-conviction hearing, the Defendant called forty witnesses to testify, including a series of lawyers who represented him during the trial proceedings. Lee Coffee and Carolyn Watkins of the Shelby County Public Defender's Office first represented the Defendant. Mr. Coffee met with the Defendant and filed pre-trial motions on his behalf. He observed no mental issues with the Defendant. Mr. Coffee's representation ended within weeks of his appointment to the case, when he accepted a position with the Shelby County

District Attorney's Office. Ms. Watkins had little recollection of the case, as she had left the Public Defender's Office three months before the Defendant's trial. Ronald Johnson of the Shelby County Public Defender's Capital Defense Team took Mr. Coffee's place as lead counsel. Betty Thomas-Moore replaced Ms. Watkins. Ms. Thomas-Moore recalled spending some time on the case but did not recall many of the specifics.

Mr. Johnson testified that, as a member of the Shelby County Public Defender's Office, he had tried seven or eight capital cases and at least fifteen murder cases prior to 1993. To prepare for the Defendant's trial, he instructed an investigator in the office to contact and interview witnesses. Mr. Johnson visited the murder scene and looked for witnesses to interview, including Ms. Davis. He interviewed Dr. Smith before the trial. Mr. Johnson did not interview Ms. Cannon before the trial, listen to her testimony from the preliminary hearing, or interview the friend who accompanied her to the victim's apartment hours before the murder. He did not interview all of the police officers who testified at trial but did review some of their reports. Mr. Johnson said he had ample time during the trial to talk to witnesses, and he did not find it necessary to hire any expert witnesses. It was his opinion that no expert witness was needed to counter Dr. Smith's testimony. He testified that, in his opinion, he was prepared for trial and had interviewed all the necessary witnesses.

As to the Defendant's mental issues, Mr. Johnson identified a medical report that his office received before the trial, which indicated that the Defendant had suffered a seizure episode approximately one month prior to the shooting. Ms. Watkins testified that she did not recall knowing about the Defendant's seizure. Both Mr. Johnson and Ms. Watkins agreed that, in hindsight, this fact should have triggered a request for funding for a psychological evaluation. Mr. Johnson testified that he did not seek funding for a mental evaluation of the Defendant because he saw no indication that the Defendant suffered from a mental disease or defect.

Mr. Johnson also testified about an issue involving allegations of the Defendant's satanic worship, which arose during the trial when Mr. Johnson cross-examined Mr. Shaw about the Defendant's reputation in the community. Mr. Shaw responded that the Defendant was respectful of his elders and did not bother anyone. The prosecutor, then on redirect examination, asked Mr. Shaw whether he had heard that the Defendant was involved in satanic worship, and Mr. Shaw answered that he had indirectly heard that information. After this exchange, the trial court instructed the jurors that they could consider the allegations of satanic worship only for the purpose of assessing Mr. Shaw's credibility as a character witness, but not as substantive evidence of satanic worship on the part of the Defendant. Mr. Johnson testified that he had received impeachment information concerning the Defendant's prior criminal history and allegations of satanic worship before trial, but did not file any motions in limine to suppress or limit the introduction of such information. He believed the

evidence was not relevant or admissible, and he did not investigate whether the Defendant was involved in satanic worship other than by asking the Defendant. Mr. Johnson conceded that he opened the door to questions of Mr. Shaw's knowledge regarding the rumors of satanic worship by asking Mr. Shaw about the Defendant's good character. No other witness testified about satanic activity, nor was any substantive proof introduced about it.

As to the plea offer made by the State, Mr. Johnson testified that the State conveyed to him a twenty-five-year plea offer on November 23, 1993. The offer was good until the next court date on January 6, 1994. Mr. Johnson waited until January 5, 1994—the day before a decision was due—to discuss the plea offer with the Defendant. The delay was due to the interceding holidays and Mr. Johnson's work on another murder trial. On January 5, 1994, he discussed the offer with the Defendant for approximately fifteen minutes. The Defendant rejected the offer; he was adamant the shooting was accidental, and he did not want to plead guilty. Mr. Johnson also discussed the offer with the Defendant the next day, but the State revoked the offer when the Defendant failed to accept it. Mr. Johnson agreed that relaying the plea offer to the Defendant the day before a decision was due might not have given the Defendant sufficient time to discuss the offer with family members, but Mr. Johnson believed it would not have made any difference. He testified that it was only after the State filed its notice of intent to seek the death penalty that the Defendant's opinion of the plea offer began to change. At the Defendant's family's request, Mr. Johnson met with the prosecutor and appealed to him to revive the offer. At that point, however, the best offer available was for life imprisonment, and the Defendant refused to accept it.

Christine Glenn testified that as a capital case investigator for the Shelby County Public Defender's Office, she conducted the investigation for the guilt phase of the trial. She stated that during the course of trial preparation, there were team meetings where information was shared. Ms. Glenn developed witness sources from the Defendant, the witnesses listed on the indictment, and other witness leads. Her notes did not reflect that the Defendant gave her names of additional witnesses. Her records indicated that she interviewed Ms. Davis, Tyron Cole, Joyce Hickman (the manager of the apartment complex where the shooting occurred), Mr. Shaw, and Jimmy Thomas. There was no record that she interviewed any other relatives, friends, or neighbors of the victim or the Defendant.

Elizabeth Benson, a mitigation expert for the Shelby County Public Defender's Office, testified that during the course of her investigation into the Defendant's life, she obtained the Defendant's school records, which did not reflect that he was a special education student; she obtained his work history, but his sole previous employer had gone out of business; and she obtained his juvenile court records, which reflected only minor offenses. The Defendant had no prior adult criminal record. Insofar as his medical history, Ms. Benson's notes reflected only medical visits for a head laceration as a child, the flu, and a seizure that occurred shortly

before the murder. Ms. Benson did not recall if she brought the seizure episode to trial counsel's attention. Ms. Benson also interviewed the Defendant's grandmother, Bernice Stephenson, about the Defendant's prior hospitalization, but did not discuss the Defendant's social or life history with her.

At the post-conviction hearing, the Defendant called several witnesses to testify about the events on the day of the shooting. Ketoe Brown, who was incarcerated in the Shelby County Jail for attempted murder at the time of the post-conviction hearing, testified that he was a childhood friend of the Defendant. He testified that on the day before the shooting, he was at the victim's apartment with the Defendant for about fifteen to twenty minutes. He stated that the victim did not act afraid of the Defendant. Mr. Brown was aware that the Defendant was dating three women, including the victim, at the time of the shooting, but he never knew the Defendant to be violent or saw the Defendant be violent with the victim. He stated that he was not contacted by the Defendant's trial counsel before the Defendant's trial.

Quinton Curry testified that he lived in the same apartment complex as the victim. Mr. Curry explained that on the morning of the shooting, between 8:00 a.m. and 9:00 a.m., he was outside of the apartment complex playing basketball with his nephew, Kareem Curry. He saw the Defendant and the victim standing in the doorway of her apartment hugging each other. They appeared to be happy. At some point that morning, the Defendant showed Mr. Curry a gun and let him fire it in the air. He returned the gun to the Defendant, and the Defendant and the victim went back into her apartment. Just as he turned his back, he heard a gunshot. Mr. Curry left the complex. He did not volunteer any information to the police, nor was he interviewed by the Defendant's lawyers or the police about his knowledge of the day of the murder. After Mr. Curry was excused as a witness, the post-conviction court noted that he appeared to suffer from some type of mental impairment.

Kareem Curry, who was incarcerated in Wisconsin at the time of the post-conviction hearing, testified that he dated the Defendant's sister when they were young teenagers. The Defendant appeared to be normal, not violent with women, and not involved in satanic ritual. Kareem Curry testified to a different version of the day's events than his uncle. Kareem Curry said that on the day of the shooting, he and his uncle were walking to play basketball at a nearby school when they came across the Defendant and the victim, who were standing close together. Kareem Curry said his uncle stopped to speak to them, but he did not testify that the Defendant allowed his uncle to fire a gun that morning nor that he heard a gunshot. Although he lived in the victim's complex for one or two years after the shooting, no one interviewed him about the events on the day of the shooting.

James Shaw testified that, on the morning of the day of the shooting, he heard a gunshot and observed Quinton Curry handing a gun back to the Defendant. The Defendant

then walked to the victim's apartment. Later that day, Mr. Shaw heard another gunshot and observed the Defendant leaving the victim's apartment. The Defendant looked at him with an expression "like he had messed up." The Defendant later returned and told Mr. Shaw he had accidentally shot the victim, although he thought the gun was unloaded at the time. Mr. Shaw stated that neither the Defendant's attorneys nor any investigator for the Defendant spoke with him before the trial.

Cynthia Nesbit, the Defendant's aunt, lived with Mr. Shaw at the time of the shooting and could see the victim's apartment from her apartment door. She stated that shortly after the shooting occurred, she saw the Defendant in the parking lot of her apartment complex. The Defendant told her that he accidentally shot the victim, and he appeared nervous, upset, and scared. Ms. Nesbit testified that she knew the victim to wear shoes that were so short her heels would hang off the back of the shoe. Ms. Nesbit also noted that she had seen burn marks on the victim's neck before the shooting. In fact, the two women had discussed how, when curling their hair with a curling iron, their arms often became so tired that by the time they got to the back of their head, the curling iron would slip and burn them.

Tracey Davis stated that she lived in the Pershing Park Apartments, next door to Ms. Nesbit and Mr. Shaw. She found the victim's body the day of the shooting. Ms. Davis testified that she was aware the victim and the Defendant were seeing each other, that the victim liked him, and that the victim had never given her any indication that she was afraid of the Defendant. Earlier in the day of the shooting, Ms. Davis saw the Defendant and the victim "hugged up" together. While she heard children crying in the apartment that day as she was doing her laundry, she never heard the adults crying or yelling. Ms. Davis also testified that she had noticed a burn on the victim's ear from the curling iron and knew the victim often burned herself with the curling iron.

Patrick Nesbit, the Defendant's uncle, testified that when he saw the Defendant after the shooting, he appeared lost and confused. He testified that he never knew the Defendant to be violent or to carry a gun.

Fred Nesbit, another of the Defendant's uncles, testified he went to visit his brother, Ashley Nesbit, at the Royal Oaks Motel on the day before the shooting. Ashley Nesbit appeared to be under the influence of drugs and was in possession of a .38 caliber pistol. Fred Nesbit was concerned for his brother and asked the Defendant to care for him. Fred Nesbit stated he found out the next day that the Defendant had been arrested for the victim's murder. Although he knew him to have quite a few relationships with women, Fred Nesbit never knew the Defendant to be violent or abusive. Fred Nesbit further stated that before the murder trial, he had not been contacted by anyone on the Defendant's behalf.

The Defendant also called several expert witnesses during the post-conviction hearing. Rachael Geiser, a fact investigator for Inquisitor, Inc., testified as an expert in the field of death penalty investigation regarding what should occur during preparation for the guilt phase of a capital case. She explained that an investigation should not be limited to information relayed by a defendant and stated that, in addition to interviewing a defendant and his/her family, trial counsel or investigators should visit the crime scene, canvas the neighborhood, and speak with any witnesses that were present at the crime scene. Investigators should also perform a criminal history check on the victim. Ten years after the murder, Ms. Geiser was able to locate multiple witnesses who claimed to have seen the Defendant and the victim hugging each other near the time of the shooting, who knew the victim never mentioned being in fear of the Defendant, who had observed that the victim was in the habit of wearing slip-on "mule" shoes that were too small for her feet, and who knew that she often burned herself with her curling iron. This information was relevant to support the defense theory of negligent, reckless, or accidental shooting. Ms. Geiser testified that the investigation leading up to the Defendant's trial did not meet the minimum standards of competent representation.

Glori Shettles, a capital case mitigation specialist with Inquisitor, Inc., testified that she was able to find numerous witnesses to counter the State's inferences that the Defendant was involved in satanic worship. Oscar Jones, Joan Jahi, Alfred Campbell, Constance Branch, Ernestine Branch, Ophelia Jones, Velma Cowens, Louise Cowens, and Ketoe Brown all testified at the post-conviction hearing and could have refuted the State's allegation that the Defendant was involved in satanic worship. They variously testified that the Defendant was raised in a Christian church, seemed to be a well-mannered young man, was not known to be affiliated with any gang, and did not have a reputation for violence. Neither trial counsel nor defense investigators contacted any of these witnesses before the murder trial.

Dr. Pamela Auble, a neuropsychologist, testified that she examined the Defendant in preparation for the post-conviction hearing. Her testing indicated that the Defendant had an I.Q. of 74 and was very impaired in his mental flexibility, i.e., his ability to take in information, sensitize it, and change his behavior accordingly. As a practical matter, this inability to adapt meant that the Defendant was prone to making the same bad decisions repeatedly. These mental deficits would have contributed to his actions after the shooting if, indeed, the shooting was accidental. She stated, for example, that leaving the scene was consistent with him not knowing what to do. Dr. Auble expressed that it should have been clear to anyone working with the Defendant that something was "not quite right." His intelligence deficit would be apparent, but his adaptation deficit would not necessarily have been obvious. Dr. Auble also testified that there was no indication that the Defendant was involved in satanic worship at the time of the shooting.

Forensic pathologist Dr. Richard Hudson was retained by post-conviction counsel to review the forensic evidence. He testified that after analyzing the evidence, he agreed for the most part with the opinions expressed by Dr. Smith at trial. He did not agree, however, that the evidence necessarily supported a finding of torture. Most of the burns were on the victim's neck and the side of her head, although there were also burns on her arm and her stomach. He stated that something hot, such as a curling iron, that touched the skin very quickly could have caused the burns. He agreed an open flame could have potentially caused a burn under the victim's chin, which had sooting around it, but stated that soot or carbon from a substance already smoldering on a curling iron could have also deposited the soot. Based on the lack of tissue reaction, Dr. Hudson estimated that some of the burns occurred within twelve to twenty-four hours of the victim's death. As for the marks on the bottom of the victim's feet, although Dr. Hudson conceded that a metal rod striking the bottom of the foot could have left such bruises, he also stated that it was possible they were caused by wearing shoes that were too small. Further, Dr. Hudson concluded that falanga was a rare and sophisticated form of torture, "highly unlikely" to be known by a nineteen-year-old inner city youth with a low I.Q. and limited education. Dr. Hudson also noted that there was no evidence that the victim was restrained in any way.

William Massey, a Memphis-based criminal defense attorney, testified as an expert in the field of death penalty litigation. He stated that under American Bar Association ("ABA") standards, defense counsel in capital cases are held to a higher standard than typically expected of a criminal defense attorney. He stated that the first task in preparing for a capital case is to assemble a team consisting of lead trial counsel, co-counsel, a fact investigator to investigate guilt/innocence issues, and a mitigation investigator, whose work would be crucial if a defendant were to be found guilty. Typically, he would also try to include a forensic psychologist as part of that team, although Mr. Massey conceded that appointed counsel seeking funds for an expert witness would be required to show a particularized need for such an expert. Mr. Massey stated that a capital defense team would investigate the defendant and witnesses in order to develop evidence from every possible source that would support a theory of defense. Mr. Massey highlighted the witness testimony from the post-conviction hearing that indicated the Defendant and the victim were acting affectionately toward one another on the morning of the shooting. He stated that such evidence tended to rebut the State's theory of premeditation and could have supported the defense theory that the shooting was a mistake or an accident. Since post-conviction counsel were able to find such witnesses years after the shooting, Mr. Massey stated that trial counsel's investigation in this regard was deficient. He believed that testimony from these witnesses could have made a difference in the outcome of the murder trial.

As to the mental issues, Mr. Massey testified that trial counsel were deficient in failing to seek the services of a forensic psychologist to evaluate the Defendant's psychological

state. Mr. Massey believed that the jury should have been permitted to consider the Defendant's low I.Q. in determining the Defendant's intent, as it would have supported the defense theory that, at best, the Defendant's behavior was reckless or negligent, or that, at worst, he lacked premeditation. Mr. Massey acknowledged, however, that the Defendant's low I.Q. was less compelling than other evidence omitted from the defense presentation. He also agreed that the ABA Guidelines did not require capital defense counsel to retain the services of a forensic psychologist or to investigate a defendant's I.Q. Nevertheless, he stated that doing so was part of the basic independent investigation required for an effective criminal defense in capital cases. Mr. Massey was critical of trial counsel's handling of the issues relating to the Defendant's involvement with satanic worship, the testimony that the victim had been tortured, and the presence of an unlit cigarette and other items found near her body. According to Mr. Massey, trial counsel's failure to adequately investigate, prepare, and present proof to rebut or explain these matters constituted deficient representation and was prejudicial to the Defendant.

## C.

The Defendant argues that trial counsel did not adequately investigate, prepare, and present witnesses with knowledge of the events prior to the shooting, the Defendant's mental health, and the facts that could rebut allegations of satanic worship and torture. The Defendant asserts that these witnesses were relevant to the issue of premeditation and, had they been properly presented, the jury would have returned a guilty verdict of a lesser offense than first degree murder.

Trial counsel has a duty to investigate and prepare a case, and this duty derives from counsel's basic function "to make the adversarial testing process work in the particular case." *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (quoting *Strickland*, 466 U.S. at 690). Counsel's duty is "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions[,]" and "what investigation decisions are reasonable depends critically on such information." *Id.* "[W]hen the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether." *Id.* Counsel is not required to interview every conceivable witness. *See, e.g.*, *Davis v. State*, 912 S.W.2d 689, 700-01 (Tenn. 1995) (finding the failure to interview a number of potential witnesses not to constitute deficient performance, as trial counsel had nonetheless adequately investigated the case); *see also Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir. 1995). The fact that a particular strategy or tactical decision failed does not by itself establish deficiency. *Goad*, 938 S.W.2d at 369. Furthermore,

[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel. Rather, courts must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and [j]udicial scrutiny of counsel's performance must be highly deferential.

*Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (alternations in original) (citations omitted) (quoting *Strickland*, 466 U.S. at 688-89) (internal quotation marks omitted).

At a post-conviction hearing, when a defendant presents a witness whom he claims should have testified at trial, the post-conviction court must determine whether such testimony would have been admissible and was material to the defense. *Pylant*, 263 S.W.3d at 869.

If the post-conviction court determines that the proffered testimony would not have been admissible at trial *or* that, even if admissible, it would not have materially aided the [defendant's] defense at trial, the post-conviction court is justified in finding that trial counsel was not deficient in failing to call that witness at trial.

*Id.* If the proffered testimony is both admissible and material, the post-conviction court must assess the witness's credibility. *Id.* at 869-70.

From a review of the record, it appears that the Defendant's trial counsel spent a minimal amount of time preparing for trial. They failed to interview a number of witnesses before trial, and instead chose to talk to them at breaks during the trial. Their performance was lackluster at best. The Defendant, however, was required to prove by clear and convincing evidence both deficient performance and prejudice. Most of the proof at the post-conviction hearing was devoted to proving the deficiencies of Defendant's trial counsel.

Even assuming that trial counsel were deficient, the Defendant did not prove by clear and convincing evidence that there was a reasonable probability that, but for any of these failures, the result would have been different. First, as to the fact witnesses that the Defendant's trial counsel failed to interview or call at trial, there is no proof that their testimony would have made a difference in the verdict reached by the jury. The post-conviction court found that their testimony was either not relevant, not credible, or inconsistent with the witnesses who had testified at trial. For example, at the post-conviction hearing, Quinton Curry testified that he saw the Defendant and the victim hugging each other in the doorway of the victim's apartment between 8:00 a.m. and 9:00 a.m. on the day of the murder. He said that the Defendant gave him his gun to shoot that morning and claimed to

hear a gunshot from the apartment just a few minutes later. Kareem Curry, however, testified to a different version of the morning's events. He stated that he and his uncle were on their way to play basketball at a nearby school and did not mention either that the Defendant gave his uncle a gun to fire or that he heard a gunshot that morning. The testimony of the Currys was also inconsistent with the Defendant's testimony at trial. The Defendant testified that he arrived at the victim's apartment around 3:00 a.m., slept on her couch, and did not wake up until 10:00 a.m. He claimed that before going to sleep, he removed all the bullets from the gun, and he never mentioned shooting the gun the next morning with Quinton Curry. Similarly, the post-conviction court found the testimony of both Ms. Nesbit and Mr. Shaw about events that occurred after the shooting to be "extremely biased," the result of a "selective memory," and untrue. Moreover, the court found that their testimony added nothing new to the evidence presented at the guilt phase of the murder trial. We defer to a post-conviction court's findings as to the credibility of witnesses or the weight of their testimony and will only substitute our findings of credibility and weight when the evidence preponderates against the trial court's findings. *Wiley v. State*, 183 S.W.3d 317, 325 (Tenn. 2006). In this case, the evidence does not preponderate against the finding by the post-conviction court that the witnesses who testified regarding the Defendant's conduct before and after the murder were not credible.

The Defendant claimed that he accidentally shot and killed the victim. The jury heard the Defendant's conflicting stories about how the shooting occurred. He told Mr. Shaw that the victim shot herself while playing Russian roulette. Then he told the police that the victim had been shot while she was playing with the gun. He later told the police that he had accidentally shot her. At trial, he testified that as he was holding the gun in both hands, he pointed it sideways to his left, and then he "fumbled it" and accidentally shot the victim. All of these versions of the shooting were in conflict with the assistant medical examiner's testimony that the bullet entered the victim's body through her left ear about five feet above the floor, traveled downward through her skull and brain, and exited behind her right ear. The Defendant also failed to explain the multiple burn marks on the victim's body or the markings on her feet. The jury simply did not believe the Defendant's version of the shooting. The jury sees and hears witness testimony and is in the best position to weigh evidence and make credibility determinations. *Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966). Accordingly, we defer to the jury's credibility determinations in this case and find that the Defendant is not entitled to relief for any failure on the part of trial counsel to adequately investigate, prepare, and present witnesses with knowledge of the events prior to the shooting, as it has not been shown that their testimony would have altered the verdict.

The Defendant next asserts that trial counsel were ineffective for failing to investigate and develop proof of his mental deficits. Further, he contends that, based on the testimony of neuropsychologist Dr. Auble, his deficiencies should have been readily apparent to trial

-16-

counsel. As a result, the Defendant argues that this proof would have supported his defense of mistake of fact or accident or possibly led to conviction for a lesser offense. The concept of diminished capacity is "a rule of evidence which allows the introduction of evidence to negate the existence of specific intent when a defendant is charged with a specific intent crime." *State v. Phipps*, 883 S.W.2d 138, 143 (Tenn. Crim. App. 1994) (citing Gayle Cohen, *Johnson v. State—Diminished Capacity Rejected As A Criminal Defense*, 42 Md. L. Rev. 522, 524 (1983)). Although evidence of a defendant's diminished capacity does not constitute a defense capable of excusing or defeating a criminal charge, evidence of a defendant's mental condition may be relevant and admissible to rebut the mens rea element of an offense. *Id.* Such evidence "is an attempt to prove that the defendant, incapable of the requisite intent of the crime charged, is innocent of that crime but may well be guilty of a lesser one." *Id.* (citing *United States v. Cameron*, 907 F.2d 1051, 1067 (11th Cir. 1990)). Testimony offered for this purpose "must demonstrate that the defendant's inability to form the requisite culpable mental state was the product of a mental disease or defect, not just a particular emotional state or mental condition." *State v. Hall*, 958 S.W.2d 679, 690 (Tenn. 1997).

Dr. Auble's testimony failed to qualify as evidence of the Defendant's diminished capacity. She did not testify that the Defendant suffered from a mental disease or defect that made him incapable of forming the requisite intent for first degree murder. The post-conviction court noted that, because Dr. Auble did not testify as to the formation of intent, she would not have been allowed to testify during the guilt phase of the trial. Further, the Defendant did not present any other evidence suggesting that his capacity for forming the necessary mental intent was diminished. Subaverage intellectual functioning does not necessarily equate to a lack of capacity to premeditate. *See Mobley*, 397 S.W.3d at 84-88. While such evidence can be introduced at the Defendant's new sentencing hearing, there is no reasonable probability that, had trial counsel pursued this line of defense, the jury would have reached a different result as to guilt. Therefore, even if this Court were to find that the failure to investigate the Defendant's limited I.Q. or psychological condition further constituted deficient performance, the Defendant has not proven through clear and convincing evidence a reasonable probability that, but for the deficiencies, the outcome of the murder trial would have been different.

The Defendant next contends that trial counsel were ineffective by opening the door to evidence of satanic worship during the testimony of Mr. Shaw, failing to object to the satanic reference, failing to file a motion in limine to exclude such evidence, and failing to investigate and prepare rebuttal to the evidence. At the murder trial, Mr. Shaw testified for the State. On cross-examination, the Defendant's trial counsel asked him about the Defendant's reputation in the community for peacefulness. He responded, "Yeah. He didn't bother nobody. You know, he'd help you if he could, but he never did—he never did bother

nobody. He seemed like to me he always tried to stay away from, you know, trouble." On redirect, the State asked Mr. Shaw if he had heard rumors of the Defendant's claims that the Defendant worshiped Satan and needed to kill two people in order to get power. Mr. Shaw responded that he had heard from others that the Defendant was involved in satanic worship, but he later clarified that his opinion of the Defendant was generally positive and that he had not heard these rumors from anyone with direct knowledge. After this exchange, the trial court instructed the jury that specific instances of bad character could only be considered for impeachment purposes and could not be considered as substantive evidence of the Defendant's good or bad character. Juries are presumed to follow the instructions of the trial court. *State v. Banks*, 271 S.W.3d 90, 137 (Tenn. 2008). No other witnesses were asked about satanic worship, and no substantive evidence of satanic ritual was ever presented. Even if trial counsel were deficient in opening the door to evidence of satanic worship during the testimony of Mr. Shaw, failing to file a motion in limine to exclude such evidence, or failing to investigate and prepare rebuttal to such evidence, we find that, because the evidence was only admissible for impeachment purposes, the Defendant has not proven by clear and convincing evidence a reasonable probability that, but for the deficiencies, the outcome of the murder trial would have been different.

The Defendant next asserts that trial counsel's performance was deficient for failure to investigate and locate witnesses who could rebut the allegations of torture. The Defendant alleges that this failure undermined the Defendant's theory that the shooting was accidental. However, the bulk of the evidence and testimony regarding the injuries to the victim and the possible causes of those injuries were introduced during the sentencing phase of the trial. The Defendant has been granted a new sentencing hearing and is free to use testimony from Dr. Hudson and other supporting witnesses to rebut the evidence of torture. Insofar as the relevance of Dr. Hudson's testimony to the guilt phase, we agree with the lower courts that his testimony offering alternate explanations for the cause of the victim's wounds was speculative. With one exception, Dr. Hudson did not disagree with Dr. Smith's testimony that the burns to the victim were inflicted within hours of her death. Dr. Hudson stated that, given the victim's negative drug screen, it was unlikely the victim had burned herself accidentally during that period. He also agreed that, based on the toughness of the skin on the soles of the victim's feet, she could have been hit without leaving any marks. While believing that the victim habitually wearing shoes too small for her feet could have caused the marks, Dr. Hudson also conceded the marks were consistent with being beaten with a long, hard, thin object. The post-conviction court held that Dr. Hudson's testimony showed only minimal disagreement with Dr. Smith, and Dr. Hudson was at a disadvantage because he did not personally examine the body. The evidence does not preponderate against this finding of the post-conviction court, and we will not disturb it. Accordingly, the Defendant failed to show by clear and convincing evidence a reasonable

probability that any deficiency in not having a forensic pathologist or other expert testify in the guilt phase affected the outcome of the murder trial.

The Defendant also alleges that trial counsel were deficient in failing to highlight the fact that the victim was a smoker and the significance of the book of matches and an unlit cigarette on the ground next to the victim's body. The Defendant alleges counsel should have argued that a person being tortured would not have had the freedom to light a cigarette, and this position would have supported his theory that the shooting was an accident. We find that this argument is more relevant to rebut the issue of torture at the sentencing hearing. Even if trial counsel were deficient in failing to raise this possibility, the Defendant failed to show by clear and convincing evidence a reasonable probability that, but for this alleged deficiency, the result would have been different. Accordingly, the Defendant is not entitled to relief on this point.

## D.

Finally, the Defendant asserts that trial counsel's representation was deficient because of the failure to communicate the plea offer to him in a timely manner and to spend an adequate amount of time to inform and educate him about the offer. He contends that given his young age, inexperience with the criminal justice system, and intellectual deficits, trial counsel should have conveyed the offer to him sooner and in such a manner that he could have appreciated it and understood the ramifications of rejecting it.

Trial counsel has the duty to "promptly communicate and explain to the defendant all plea offers made by the prosecuting attorney." *Frye*, 132 S. Ct. at 1408 (citing ABA Standards for Criminal Justice, Pleas of Guilty 14–3.2(a) (3d ed. 1999)). The promptness standard is also included in the Tennessee Rules of Professional Conduct. *See* Tenn. Sup.Ct. R. 8, RPC 1.4(a)(1) & cmt. 2 (requiring that the lawyer promptly consult with and inform the client of the substance of a proffered plea bargain in a criminal case unless the client has previously indicated that the proposal will be acceptable or unacceptable or has authorized the lawyer to accept or to reject the offer). "[A] lawyer must abide by his client's decision [to accept or reject a plea] only after having provided the client with competent and fully informed advice, including an analysis of the risks that the client would face in proceeding to trial." *Burt*, 134 S. Ct. at 19. The United States Supreme Court has held that a defendant claiming that trial counsel's performance was deficient in the plea negotiations process has the burden to show by a reasonable probability that, but for counsel's deficient representation, (1) the defendant would have accepted the plea, (2) the prosecution would not have withdrawn the offer, and (3) the trial court would have accepted the terms of the offer, such that the penalty under its terms would have been less severe than the penalty actually imposed. *Lafler*, 132 S. Ct. at 1385. We agree that this is the appropriate standard for

determining whether a defendant is entitled to relief for ineffective assistance of counsel during the plea negotiation process and therefore apply the *Lafler* standard here. *See, e.g.*, *Alcorn v. State*, 121 So. 3d 419, 430 (Fla. 2013) (applying the *Lafler* standard when analyzing ineffective assistance of counsel claims within the context of the plea negotiation process); *People v. Douglas*, 852 N.W.2d 587, 606 (Mich. 2014) (same); *Commonwealth v. Marinho*, 981 N.E.2d 648, 661 (Mass. 2013) (same).

Trial counsel waited some six weeks after receiving the twenty-five-year offer to convey it to the Defendant and, when he did so, spent very little time discussing the offer. Neither trial counsel's heavy caseload nor the intervening holidays excused prompt and diligent communication with the Defendant. However, the post-conviction court accredited Mr. Johnson's testimony that the Defendant asserted from the beginning that the shooting was accidental and, thus, he would not plead guilty. The trial court did not find credible the Defendant's mother's testimony that her son wanted to accept the plea offer. His mother testified that this occurred during the "Ice Storm of 1994," which the post-conviction court observed occurred in February of 1994, well after the State withdrew the twenty-five-year plea offer. The evidence does not preponderate against these credibility determinations of the trial court.

Most significantly, the Defendant presented no proof that he would have taken the plea offer had it been presented to him earlier. *See State v. Garrison*, 40 S.W.3d 426, 431 (Tenn. 2000) (stating that although the evidence established deficient performance by counsel's failure to convey a plea offer, prejudice was established only if the evidence also showed a reasonable probability that the defendant would have accepted the plea offer if properly conveyed). Because the Defendant failed to show that he would have accepted the plea, he is not entitled to relief on this issue.

## Conclusion

We conclude that the Defendant did not prove by clear and convincing evidence a reasonable probability that, but for the deficient performance of his trial counsel, the verdict of guilt for first degree murder would have been different. The judgment of the Court of Criminal Appeals is affirmed, and the case is remanded to the trial court for a new sentencing hearing. It appearing from the record that the Defendant is indigent, costs on appeal are assessed to the State of Tennessee.

_____
SHARON G. LEE, CHIEF JUSTICE