IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 5, 2016

## DERRICK RICE v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 08-07884      J. Robert (Bobby) Carter, Jr., Judge

_____

**No. W2015-00226-CCA-R3-PC  -  Filed March 29, 2016**

_____

The Petitioner, Derrick Rice, appeals as of right from the post-conviction court's denial of his petition for post-conviction relief wherein he challenged his convictions for first degree premeditated murder and attempted first degree murder. In this appeal, the Petitioner contends that he received ineffective assistance of counsel in the following ways: (1) general sessions counsel[1] failed to consult with the Petitioner regarding a plea offer from the State and to explain the consequences of declining that offer; (2) trial counsel failed to investigate and subpoena witnesses; (3) general sessions counsel and trial counsel failed to adequately communicate with the Petitioner; and (4) trial counsel failed to adequately investigate and prepare the case for trial.[2] Discerning no error, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

Mitchell Wood, Memphis, Tennessee, for the appellant, Derrick Rice.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Amy P. Weirich, District Attorney General; and Meghan Fowler, Assistant District Attorney General, for the appellee, State of Tennessee.

_____

[1]The Petitioner was represented by two attorneys, both of whom he alleges rendered ineffective representation. We will refer to the attorney who represented him in general sessions court as "general sessions counsel" and the attorney who represented him at trial as "trial counsel."

[2] For the sake of clarity, we have slightly renumbered and reworded the issues as presented by the Petitioner in his brief.

# OPINION

## FACTUAL BACKGROUND

Detailed facts underlying the Petitioner's convictions were recounted by a panel of this court on direct appeal. See State v. Derrick Rice, No. W2010-02421-CCA-R3-CD, 2011 WL 5420818 (Tenn. Crim. App. Nov. 9, 2011), perm. app. denied (Tenn. Mar. 7, 2012). Briefly, on June 1, 2008, Michelle Wright was sitting on the back steps of her house with her son, Antonio Polk, when she noticed that the Petitioner "was walking through her house from the kitchen and was about to exit through the back door." Ms. Wright and the Petitioner had been dating for approximately three months, but she was not expecting him at her house at that time. The Petitioner walked out the back door, asked Ms. Wright what she was doing, and then "shared some words" with Mr. Polk. Mr. Polk then looked at the Petitioner and got up from the steps. The Petitioner obtained a gun from his pocket and shot Mr. Polk. Ms. Wright jumped up and began to run away from the Petitioner. During her flight, the Petitioner shot her in the back. Ms. Wright ran to her brother's house, located next-door, where she waited for an ambulance to transport her to the hospital. Id. at *1.

Gary Wright, Ms. Wright's brother, was at home when he heard two gunshots. Rice, 2011 WL 5420818, at *1. He went to his front door and saw his nephew, Mr. Polk, standing outside the door with his hand pressed to his neck. Mr. Wright heard his sister's screaming, and he saw her running toward his house. Mr. Wright saw that the Petitioner was behind Ms. Wright, and he watched as the Petitioner aimed his gun and shot her. Id. Ms. Wright was able to make it inside Mr. Wright's home. Id. at *2. By the time paramedics arrived, Mr. Polk was deceased. Id. at *3. The cause of death was later determined to be a single gunshot wound to his torso, and, according to the medical examiner, the wound was consistent with Mr. Polk running at the time he was shot. Id. at *4.

After shooting Ms. Wright, the Petitioner lingered across the street from Mr. Wright's home, and shortly thereafter, he was arrested. Rice, 2011 WL 5420818, at *2. Officer Christopher Ross of the Memphis Police Department ("MPD") was one of the first officers to arrive on the scene and helped apprehend the Petitioner. The Petitioner was placed in the back of Officer Ross's patrol car, and while Officer Ross was filling out paperwork, the Petitioner said, "I told them not to f--k with me. . . . I was trained by the military. I was a trained killer, and that's my job, and they had no business f--king with me like that." According to Officer Ross, this statement was spontaneous. Also, although the Petitioner smelled like alcohol, he was speaking coherently. Id.

MPD Officer Joseph Stark interviewed the Petitioner the day after the shooting. Rice, 2011 WL 5420818, at *3. He waited until then to conduct the interview due to the

Petitioner's intoxication at the time of his arrest. Before Officer Stark finished going through the advice of rights, the Petitioner said he was sorry for shooting Mr. Polk and Ms. Wright. The advice of rights was given, and before saying anything else, the Petitioner requested to speak with an attorney. However, before being transported back to jail, the Petitioner changed his mind and waived his right to speak with an attorney. The Petitioner told Officer Stark that he had spoken with Mr. Polk on the phone the day of the shooting and that Mr. Polk was "talking stupid" and hung up on him. The Petitioner said that he took a gun with him to Ms. Wright's house because Mr. Polk had threatened him in the past. Specifically, Mr. Polk told him that "if [the Petitioner] touched [Ms. Wright,] he was going to bust [his] head." Id. (second alteration in original). According to the Petitioner, when he arrived at the house, Mr. Polk stood up "like he was fixing to do something," and the Petitioner started shooting. Id. The Petitioner told Officer Stark that he drank a half pint of whiskey and a quart of beer on the day of the shooting. Id.

The defense did not put on any proof, and a jury convicted the Petitioner of first degree premeditated murder and attempted first degree premeditated murder. Rice, 2011 WL 5420818, at *4. The trial court sentenced the Petitioner to terms of life imprisonment and fifteen years, respectively, to be served concurrently. Id. at *1.

The Petitioner filed a pro se petition for post-conviction relief on January 2, 2013, and on January 8, 2013, the post-conviction court dismissed the petition as untimely. The Petitioner appealed the summary dismissal of his petition, and a panel of this court reversed the decision of the post-conviction court. Derrick Rice v. State, No. W2013-00774-CCA-MR3-PC, 2014 WL 792149, at *2 (Tenn. Crim. App. Feb. 20, 2014). This court noted that, in his petition, the Petitioner had failed to include the date that our supreme court denied his application for permission to appeal—March 7, 2012. The post-conviction court had apparently relied upon the November 9, 2011 decision by this court when determining that his January 2, 2013 petition was untimely. Therefore, we concluded that the January 2, 2013 petition was timely filed "within one (1) year of the date of the final action of the highest state appellate court to which an appeal [was] taken," see Tennessee Code Annotated § 40-30-102(a), and the cause was remanded for further proceedings in accordance with the Post-Conviction Procedure Act. Id. at *1, *2.

Following remand, counsel was appointed, and a "Fourth Amended Petition for Relief from Conviction or Sentence" was filed on July 17, 2014.[3] In that petition, the Petitioner alleged that (1) general sessions counsel was ineffective for failing to advise him of the consequences of rejecting a plea offer from the State; (2) trial counsel failed to investigate, subpoena, and call necessary witnesses; (3) trail counsel failed to "pursue any

---

[3] No previous petitions are included in the record.

constitutional violations," namely, suppression motions relating to the Petitioner's confession; (4) trial counsel failed to adequately communicate with the Petitioner; (5) trial counsel failed to pursue appropriate defenses, in particular, a claim of self-defense; and (6) new evidence in the form of a lease for the apartment where the shooting took place had been located and that lease could have impeached Ms. Wright's testimony.[4]

The post-conviction court held evidentiary hearings on November 25 and December 10, 2014. The Petitioner testified that he was appointed counsel in general sessions court, where he had been charged with second degree murder and attempted second degree murder. According to the Petitioner, general sessions counsel did not inform him of any plea offers from the State; however, he "later" learned from his sister that the State had extended a plea offer. He said that "later" meant after his case had been transferred to criminal court. The Petitioner testified that he found out about the offer when his sister asked him why he did not take it. He said that he thought "it was [twenty] years or something."

The Petitioner said that he waived his preliminary hearing but that he "really didn't know what [he] was doing" because general sessions counsel did not explain what a preliminary hearing was to him. The Petitioner estimated that general sessions counsel visited him one time in jail and that they "really, didn't discuss anything" during that visit. According to the Petitioner, general sessions counsel did not discuss "what would happen . . . if [his] case went upstairs"—in particular, that he might be indicted for first degree murder.

The Petitioner said that trial counsel was appointed to represent him during his first appearance in criminal court. Trial counsel advised the Petitioner that the State might indict him for first degree murder, which the Petitioner did not understand because he had previously been charged with second degree murder. He claimed that trial counsel never showed him a copy of the indictment. The Petitioner also said that trial counsel never explained what the State would have to prove in order to convict him of first degree murder. However, the Petitioner acknowledged that trial counsel did explain the meaning of premeditation to him, although it "didn't make any sense to [him]" because he thought that "premeditation [was] something that you sit up and think about for a long time."

The Petitioner testified that he wanted MPD Officer Michael Jackson to be called as a witness at his trial. Officer Jackson was one of the officers who arrested the Petitioner. The Petitioner said that Officer Jackson was the person who informed him that he had actually shot someone, because prior to his arrest, the Petitioner claimed to be

---

[4] These issues have again been slightly reworded and consolidated for clarity.

unaware that he had hit anyone when he fired his pistol. He said that while he "[did not] know" what Officer Jackson would have testified to, the Petitioner thought "he would have told the truth about what really happened."

The Petitioner also said that he thought his mother should have been called as a witness. According to the Petitioner, his mother was present when Ms. Wright "called looking for [the Petitioner]" on the day of the shooting and when Ms. Wright "sent [Mr. Polk] down looking for [him]."

The Petitioner told trial counsel that he shot Ms. Wright and Mr. Polk in self-defense. He explained that he felt "threatened" and had "tried to leave," but both victims followed him, and he "just pulled [his] pistol out and was shooting." The Petitioner said that he thought Mr. Polk had a weapon in his hand, and the Petitioner had "turned and walked away" after speaking with Ms. Wright when Mr. Polk "jumped up and came toward [him]."

The Petitioner testified that he and trial counsel discussed the statement he made to police following his arrest. According to the Petitioner, he told trial counsel that the police had "changed [his statement] around to make it look like [he] was guilty." The Petitioner said that he was arrested immediately after the shooting, but he denied making any statement regarding the shooting until he was questioned by detectives the next day.

The Petitioner said that he knew that to prevail on a claim of self-defense, he would have to show that he "had to be in a place where [he] had permission to be." Thus, he told trial counsel that he resided at the address where the shooting occurred and that his residence could be confirmed by obtaining the lease. The Petitioner remembered trial counsel's telling him that she attempted to get the lease but was unsuccessful. Post-conviction counsel introduced a copy of the lease at the hearing, which showed the Petitioner as the lessee of the relevant address. The Petitioner confirmed that the lease appeared to be the same as when he signed it. However, according to the Petitioner, Ms. Wright had testified at trial that the lease was in her name.

On cross-examination, the Petitioner said that he had never been through a process involving a preliminary hearing before. The Petitioner admitted that he had previous convictions, but he insisted that he did not understand what a preliminary hearing was at the time he waived his appearance in the instant case.

The Petitioner said that by the time he learned about the State's plea offer from his sister, "It was gone." Also, the Petitioner maintained that he was unaware that he had been indicted for first degree murder, and he explained that he and trial counsel talked about premeditation after he asked her what "murder" meant. However, the Petitioner later admitted that trial counsel did tell him "about first degree murder," which he did not

understand because he still thought he had been charged with second degree murder. He further said that he "had no papers on murder in the first degree."

The Petitioner testified that he and trial counsel discussed calling Officer Jackson as a witness "for a second," but the Petitioner thought that Officer Jackson "couldn't make it to court that day."

On re-direct, the Petitioner was again questioned regarding his understanding of the charges against him. He averred that trial counsel told him that he could be charged with first degree murder because the State "can do anything [it] want[s] to do." According to the Petitioner, this conversation took place just before trial. He said that, at that time, the State extended an offer of twenty-five years, but after he "signed for it," the State retracted the offer.

Trial counsel testified that she worked for the Shelby County Public Defender's Office. After being appointed to the Petitioner's case, she discussed the charges he was facing with him. Additionally, she provided him with a discovery packet, which included a copy of the indictment showing that he had been charged with first degree murder and attempted first degree murder. According to trial counsel, she was unaware of any confusion on the Petitioner's part regarding the indictment until she learned of his post-conviction claims.

Trial counsel said that on the Petitioner's trial date, the State offered him a twenty-five-year sentence in exchange for his pleading guilty to "murder second." Trial counsel discussed this offer with the Petitioner, explaining his exposure if he proceeded to trial and was convicted as charged or instead of the lesser included offense of second degree murder. However, that offer was ultimately rejected by the "higher-ups in the Attorney General's Office," and they "had to go to trial on murder first."

Trial counsel testified that "[o]ne of the first things" she did after being appointed to the Petitioner's case was to obtain the general sessions file and to speak with general sessions counsel. Trial counsel said that her understanding was that the Petitioner had been offered a twenty-year sentence in general sessions, which was communicated to him, but that he ultimately objected. Trial counsel agreed it was "[a]bsolutely" the policy of the Public Defender's Office to communicate offers to clients, saying, "It's our duty." Trial counsel stated that, generally, a plea offer would only be communicated to a family member after obtaining the client's permission.

Next, trial counsel testified that she made a conscious decision not to call Officer Jackson as a witness because "his testimony . . . was not going to be helpful to [the Petitioner]." Trial counsel said that her strategies for the Petitioner's defense included arguing voluntary intoxication and self-defense. She noted that the Petitioner was so

intoxicated at the time of his arrest that the police could not interview him. Also, the Petitioner told her that he was threatened by Ms. Wright's son and "felt he needed to defend himself." According to trial counsel, Officer Jackson was present when the Petitioner made a "spontaneous utterance that he shot [the victims] . . . and that he hoped they died." Trial counsel did not think this testimony would be helpful to the defense.

Trial counsel said that the Petitioner's case was initially investigated while in general sessions and again once it moved to criminal court. In her estimation, the investigation into the Petitioner's case was thorough.

Trial counsel testified that she requested a self-defense jury instruction, but the trial court denied that request. She surmised that the trial court did not think that defense was supported by the proof. Trial counsel said that the Petitioner's gun was the only weapon found at the scene, and Ms. Wright's testimony was that the Petitioner was the primary aggressor. The jury was instructed on voluntary intoxication.

With respect to the lease, trial counsel acknowledged that she never got a copy of the lease but said that she "didn't see how [the lease] was going to help."

On cross-examination, trial counsel said that she could not remember the exact date that she discussed the first degree murder charge with the Petitioner. However, she noted that the Petitioner was arraigned on January 6, that she prepared motions on January 9, and that she met with him on February 4, at which time she provided him with the discovery materials. She said that, due to the passage of time, she could not "specifically remember" putting the indictment into the discovery packet but that it was "customary" for her to do that, and she therefore assumed that she did so in this case. Trial counsel explained that the Petitioner was interested in the twenty-five-year plea offer because "[h]e understood what his exposure was if he went to trial on murder first."

Trial counsel testified that, according to her case notes, the Petitioner told Officers Ross and Jackson that he shot the victims and that he hoped "all those MFs die." She described the statement as a "spontaneous utterance." Counsel said that the Petitioner was extremely intoxicated at the time and had trouble remembering exactly what had happened after the shooting.

Trial counsel sent a copy of the indictment, affidavit of complaint, autopsy results, the Petitioner's statement, witness statements, and compact discs from the autopsy and crime scene to a former coroner whom she sometimes utilized as an expert witness. She asked for his opinion regarding the feasibility of a self-defense theory, but after reviewing the evidence, he responded that "there was nothing he could really do to help [counsel] as far as [providing] any kind of insight into [the case]." Trial counsel said that, specifically, he was unable to provide any assistance with the claim of self-defense.

-7-

To the best of trial counsel's recollection, she was unable to locate the lease because either the landlord "had gone out of business" or "the property had been sold." Trial counsel agreed that one of the elements needed to support a claim of self-defense was that the Petitioner had a right on be on the property. Nevertheless, she did not believe that a copy of the lease would have helped because of "what the rest of the testimony was."

Trial counsel testified that she discussed the Petitioner's testifying on his own behalf and advised him of the potential benefits and pitfalls of doing so. She said that, ultimately, the decision not to testify was the Petitioner's alone.

The hearing was continued to December 10, 2014, at which time general sessions counsel testified that she was employed with the Shelby County Public Defender's Office and that she worked in the general sessions division where she handled felony preliminary hearings. She confirmed that she represented the Petitioner in general sessions court after he was charged with second degree murder and attempted second degree murder. She remembered meeting with the Petitioner twice in jail and once or twice in court. General sessions counsel also recalled meeting with the Petitioner's sister and niece.

According to general sessions counsel, the State offered a twenty-year sentence in exchange for his pleading guilty, which she relayed to the Petitioner. She said that her case notes reflected that she had "quite a lengthy discussion" with the Petitioner "about all of his options." Also, the Petitioner asked her what to do, but she responded that it was his decision whether to accept the offer. She was adamant that she told the Petitioner about the State's offer, saying that she always conveyed offers to her clients because they "absolutely have a right to know" about plea offers. General sessions counsel advised the Petitioner that "if he waived this to the grand jury," he could possibly be charged with first degree murder. They "talked for quite a while in court and ultimately he said he just wanted to waive everything . . . ." Counsel said that the Petitioner signed a "waiver bind over," which she explained to him.

According to general sessions counsel, the Petitioner never indicated to her that he was confused or did not understand the process. Further, she said that they "were able to always converse about his case. He asked appropriate questions. [They] talked logically about it. So at no time was there any red flag that he didn't understand what [they] were talking about."

On cross-examination, general sessions counsel consulted case notes that she made contemporaneously to discussions she had with the Petitioner. Her notes reflected that she told the Petitioner that she could not tell him what to do, "just that the offer had been made[,] and [the Petitioner] [said] he want[ed] to waive and get out of court because

[it was] cold." She affirmed that "cold" referred to the temperature of the courtroom. Her notes also commemorated a discussion with the Petitioner about a possible indictment for first degree murder. Counsel's notes reflected that the State had said it "would not push for murder one" but also would not guarantee that its position would not change in the future. Also according to the notes, she "[t]horoughly discussed this with [the Petitioner]."

General sessions counsel said that she did not have a specific recollection of discussing the facts of the case with the Petitioner but that she "had done an investigation request," and it was her custom to go over the results of investigations with her clients. General sessions counsel further agreed that "besides possibly discussing first-degree murder," she did not remember "specifically" what about first-degree murder that she discussed with the Petitioner.

Upon this proof, the post-conviction court denied the Petitioner's claim of ineffective assistance of counsel as it related to both general sessions counsel and trial counsel. The court dismissed the Petitioner's argument that trial counsel's failure to obtain the lease was deficient, concluding that the Petitioner's "decision not to testify was the reason for the lack of a self-defense instruction." The court noted that the decision whether to testify was the Petitioner's, and the record reflected that he was ultimately responsible for deciding not to testify. The post-conviction court determined that "counsel was clearly prepared, had a defense strategy in place, and argued for [the] Petitioner as well as [she] could."[5]

## ANALYSIS

On appeal, the Petitioner contends that general sessions counsel was ineffective for failing to consult with him regarding a plea offer from the State. He further avers that trial counsel was ineffective for failing to investigate and subpoena witnesses, for failing to adequately communicate with the Petitioner, and for failing to "investigate the indictment, defenses, motions, and evidence." The State responds that general sessions

---

[5] We note that although the post-conviction court's order denying relief contains a section entitled "Findings of Fact," the court merely recounts the testimony presented at the evidentiary hearing without making factual findings or credibility determinations with respect to the evidence presented. However, the order does set forth reasons for denying post-conviction relief, as outlined above. Entry of a detailed order pursuant to Tennessee Code Annotated section 40-30-111 greatly facilitates this court's review of the underlying proceedings. ("Upon the final disposition of every petition, the court shall enter a final order, and . . . shall set forth in the order or a written memorandum of the case all grounds presented, and shall state the findings of fact and conclusions of law with regard to each ground.") Nevertheless, the Petitioner takes no fault with the court's order, and we conclude that it is sufficient to permit appellate review. See State v. Swanson, 680 S.W.2d 487, 489 (Tenn. Crim. App. 1984).

counsel and trial counsel rendered effective representation in all respects and, additionally, that the Petitioner has waived his allegation regarding interviewing witnesses because he failed to call them at the evidentiary hearing.

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger v. State, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. Prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger, 279 S.W.3d at 293-94 (Tenn. 2009). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

First, the Petitioner contends that general sessions counsel failed to convey the State's original twenty-year offer. Although a defendant does not have a constitutional

right to engage in plea bargaining, see Mabry v. Johnson, 467 U.S. 504, 507 (1984); State v. Turner, 919 S.W.2d 346, 350 n.2 (Tenn. Crim. App. 1995), once plea negotiations are instigated, a defendant is entitled to effective assistance of counsel throughout the negotiation process, see Nesbit v. State, 452 S.W.3d 779, 787 (Tenn. 2014) (citing Missouri v. Frye, -- U.S. --, 132 S. Ct. 1399, 1407-09 (2012)), cert. denied, Nesbit v. Tennessee, 135 S. Ct. 1853 (Apr. 20, 2015). Accordingly, trial counsel's complete failure to communicate a plea offer to a defendant constitutes deficient performance, and the defendant's ignorance of a plea offer undermines confidence in the outcome of the prosecution. See Harris v. State, 875 S.W.2d 662, 665-66 (Tenn. 1994).

In his petition for post-conviction relief, the Petitioner asserted that general sessions counsel did not explain to him the potential consequences that might flow from his rejection of the State's twenty-year offer. Specifically, he claimed that "counsel explained that his exposure at trial would be greater, but failed to explain that the offer of [twenty] years might be rescinded and not renewed at the [c]riminal [c]ourt level." However, at the evidentiary hearing, the Petitioner alleged that general sessions counsel failed completely to convey that offer to him. The Petitioner's credibility on this matter is greatly undermined by the contradictions between his claims in the petition and those made at the evidentiary hearing.

At the evidentiary hearing, general sessions counsel recalled that she thoroughly discussed the offer with the Petitioner, explaining the advantages and consequences of accepting the offer, and her notes made contemporaneously corroborated that account. Likewise, through discussions with general sessions counsel, trial counsel understood that the State had extended a twenty-year offer, which the Petitioner chose to reject. The Petitioner argues that his acceptance of the later twenty-five-year offer supports his allegation that general sessions counsel did not inform him of the twenty-year offer. However, the Petitioner's acceptance of the twenty-five-year offer could also be explained by the fact that he had been subsequently indicted for first degree premeditated murder and attempted first degree murder and was facing a much longer sentence if convicted. Indeed, trial counsel testified that the Petitioner accepted the twenty-five-year offer because "[h]e understood what his exposure was . . . ." Based upon this evidence, we conclude that the Petitioner has failed to prove by clear and convincing evidence his factual allegation that general sessions counsel did not convey the plea offer to him and did not discuss the repercussions of rejecting that offer. Thus, he is not entitled to relief on this matter.

Next, the Petitioner asserts that trial counsel was ineffective for failing to call Officer Jackson and his mother as witnesses. However, it is well-established that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner

-11-

at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "[T]his is the only way the petitioner can establish that . . . failure to call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." Id. Because the Petitioner did not produce either of his proposed witnesses at the evidentiary hearing, he has failed to establish that counsel was ineffective in this respect. This issue is without merit.

The Petitioner also asserts that both general sessions and trial counsel failed in their duty to communicate with him. Particularly, the Petitioner alleges that general sessions counsel did not "advise him of the consequences of waiving his right to a preliminary hearing and the ability of the State to seek indictment for greater offenses." With respect to trial counsel, he contends that "he remained ignorant of the greater charges set out in the indictment until his case was set for trial." Again, general sessions counsel's case notes belie the Petitioner's recollection of events. General sessions counsel said that she specifically advised him regarding the possibility that the State might indict him for first degree premeditated murder and attempted first degree murder. She recalled talking "for quite a while" with the Petitioner about his options, and he ultimately decided to waive his right to a preliminary hearing. Furthermore, the Petitioner's own testimony at the evidentiary hearing was that trial counsel did in fact discuss the criminal court indictment with him and that they talked about first degree murder. Based upon this evidence, we again conclude that the Petitioner has not proven his factual allegations by clear and convincing evidence.

The Petitioner alleges that trial counsel should have "investigated the facts surrounding the Petitioner's incriminating statements" to determine whether filing motions to suppress was warranted. However, there are several problems plaguing this contention. First, at the hearing, the Petitioner's sole testimony relevant to this issue was his statement that he told trial counsel that the police had "changed [his statement] around to make it look like [he] was guilty." Trial counsel was not asked any questions about the Petitioner's statements to police or her opinion as to whether motions to suppress would have been appropriate. Also, in his petition, the only mention of a motion to suppress comes during a discussion about counsel's failure to call Officer Jackson. The petition sets forth the argument that Officer Jackson's testimony would have "refuted the testimony of Officer Ross who testified as to [the] Petitioner's alleged spontaneous utterances prior to his interrogation." Thus, according to the Petitioner, "[h]ad trial counsel properly investigated and interviewed [Officer Jackson], . . . [the] Petitioner's statements may well have been suppressed." In his brief in the instant appeal, however, the Petitioner changes course and alleges more generally that trial counsel should have more thoroughly investigated the circumstances surrounding his statements to police. However, as we noted above, any argument related to what Officer Jackson's testimony might have been must fail due to the Petitioner's failure to call him as a witness at the

evidentiary hearing. Furthermore, the Petitioner cannot reformulate issues on appeal and expect this court to grant relief. See Tenn. Code Ann. § 40-30-106(g) ("A ground for relief is waived if the petitioner . . . failed to present it for determination in any proceeding before a court of competent jurisdiction . . . ."); Tenn. R. App. P. 36. Ultimately, because the Petitioner offered no meaningful testimony on this issue at the hearing and does not even allege that a motion to suppress was appropriate or would have been granted, we conclude that this issue is without merit. See Demarcus Sanders v. State, No. W2012-01685-CCA-R3-PC, 2013 WL 6021415, at *4 (Tenn. Crim. App. Nov. 8, 2013) ("If a petitioner alleges that trial counsel rendered ineffective assistance of counsel by failing to . . . file a motion to suppress . . . the petitioner is generally obliged to present . . . the [evidence supporting his claim] at the post-conviction hearing in order to satisfy the Strickland prejudice prong.")

Finally, the Petitioner contends that trial counsel "failed to discuss the potential strategies and tactical choices with [him], and as a result, the defense strategies of intoxication and self-defense were not properly developed." With respect to the defense of voluntary intoxication, there was apparently no question that the Petitioner was intoxicated at the time of the shooting. The jury was instructed on this defense but nonetheless rejected it.

Concerning the lease, at the hearing the Petitioner testified that trial counsel failed to procure a copy of the lease for the house where the shooting occurred, which would have proven that he was the lessee and was legally on the property at the time. He stated his belief that his theory of self-defense was severely weakened by this failure. Trial counsel, on the other hand, attributed the trial court's refusal to submit a self-defense instruction to the jury to the rest of the proof introduced. At trial, Ms. Wright testified that after "shar[ing] some words]" with Mr. Polk, the Petitioner shot Mr. Polk. As Ms. Wright was fleeing, the Petitioner took aim and shot her in the back. Mr. Wright also testified that he saw the Petitioner shoot Ms. Wright as she was running toward Mr. Wright's home. After his arrest, the Petitioner admitted that he shot the victims after they "jumped up and ran." The post-conviction court found that the Petitioner's decision not to testify was the reason a self-defense instruction was not given. Accordingly, we conclude that even had the Petitioner proven that he was lawfully upon the premises when he shot the victims, the trial court would still have not instructed the jury on self-defense due to the rest of the evidence adduced at trial. The Petitioner has not proven prejudice and is not entitled to relief.

## CONCLUSION

Based upon the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE