IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 9, 2022

## TAVARES DEWAYNE BUCHANAN V. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2016-A-196      Mark J. Fishburn, Judge**

_____

### No. M2021-00391-CCA-R3-PC

_____

The petitioner, Tavares Dewayne Buchanan, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received the effective assistance of counsel. Following our review, we affirm the post-conviction court's denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Manuel B. Russ (on appeal) and Sean McKinney (at hearing), Nashville, Tennessee, for the appellant, Tavares Dewayne Buchanan.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Glenn Funk, District Attorney General; and Tammy Meade, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Facts and Procedural History*

The petitioner was convicted of two counts of rape, and one count each of aggravated kidnapping, aggravated assault, felon in possession of a firearm, and unlawful photography for which he received an effective sentence of ten years in incarceration followed by ten years on probation. This Court affirmed the petitioner's convictions on direct appeal, and the Tennessee Supreme Court denied further appellate review. *State v. Tavares Dewayne Buchanan, aka Tavarea Dewayne Buchanan*, No. M2017-02268-CCA-

R3-CD, 2019 WL 852192 (Tenn. Crim. App. Feb. 21, 2019), *perm. app. denied* (Tenn. Apr. 11, 2019).

The evidence introduced at trial showed the victim of the offenses and the petitioner previously dated and had three children together, but they did not live together at the time of the offenses. *Id*. at *1. On Christmas Day in 2015, the petitioner celebrated with the victim's family at the home of one of the victim's relatives. *Id*. According to the victim, "Everyone at the party was 'having fun' and, at one point, all of the women, including her, were dancing. The majority of the time, the Defendant was in another room with his male relatives." *Id*. When the party ended, the victim drove home with the three children, carried them inside one by one, and then returned to her car to retrieve their presents. *Id*. On her final trip inside, she saw the petitioner standing in her unlit living room. *Id*. The petitioner confronted the victim about her behavior at the Christmas party, explaining she had disrespected him in the way she danced in front of the other guests. *Id*. The petitioner hit the victim in the stomach, causing her to fall to the ground, and then "hit, kick[ed], and stomp[ed]" on her before dragging her upstairs by her hair and shirt. *Id*.

Once upstairs in the victim's bedroom, the petitioner continued to beat the victim and cut off pieces of her hair. *Id*. He also forced her to undress and poured hand sanitizer on her body. *Id*. The petitioner pulled out a revolver, put a bullet in the chamber, spun the cylinder, and pointed it at the victim. *Id*. He pulled the trigger and, when it did not fire, exclaimed, "[W]oo hoo, b****, you got lucky[.]" *Id*. The petitioner then gave the gun to the victim and instructed her to kill herself. *Id*. The victim put the gun in her mouth but cried to the petitioner that she could not pull the trigger. *Id*.

The ordeal continued with the petitioner threatening the victim with the gun, pouring cold water on her in the shower, and beating her with a belt. *Id*. at *2. The petitioner took videos of the victim naked and wrote the word, "F***," on her forehead, saying he would post the videos on a prostitution website the next time the victim wanted to "show out." *Id*. The petitioner then dragged the victim downstairs and told her to dance like she had at the party. *Id*. The petitioner hit the victim with a belt while she danced, and then stood behind her and penetrated her vagina with his penis. *Id*. The petitioner also ordered the victim to perform oral sex on him. *Id*. The petitioner eventually allowed the victim to go to bed, and she ultimately felt free to leave her home around 4:00 p.m. the following day after the petitioner left. *Id*.

The petitioner filed a timely pro se petition for post-conviction relief. Following the appointment of counsel, the petitioner filed an amended petition in which he argued trial counsel was ineffective, in part, because counsel "failed to communicate with [him] when counsel failed to relay plea deals and settlement offers conveyed by the state." The petitioner expounded on this allegation by claiming counsel "misunderstood or

misinformed him about the details of his plea agreement." The petitioner said he learned the evening before trial during a phone call with his mother and the victim that the State had made an offer involving split confinement, but counsel never presented such offer to him. When he confronted counsel about the offer, counsel informed him the most recent offer was for a ten-year sentence to serve; therefore, counsel either misunderstood or failed to convey the split confinement offer.

The post-conviction court conducted an evidentiary hearing over the course of two dates.[1] The petitioner's mother, Sheena Buchanan, testified she was in frequent communication with counsel leading up to and during the trial. According to her, the petitioner did not "understand a lot of things," so she tried to help the petitioner understand the information conveyed by counsel.

Ms. Buchanan recalled that she and victim, the mother of Ms. Buchanan's grandchildren, were "in a good place" during the pendency of trial and kept in regular communication. Ms. Buchanan was aware the petitioner and the victim were also in communication leading up to trial. At one point close to trial, possibly the night before, Ms. Buchanan facilitated a three-way conversation between the petitioner, the victim, and herself. During the phone call, the victim told the petitioner she was going to do all she could to help him and discussed a plea offer involving service of four or five years mentioned to her by the State. The victim encouraged the petitioner to take the plea deal by referring to her own prior prison sentence in which she served five years. The petitioner indicated he was not aware of the offer mentioned by the victim.

Ms. Buchanan claimed she and other members of her family tried to talk to counsel the morning of trial to ask about the plea offer mentioned by the victim the previous night, but counsel "brushed [them] off." Ms. Buchanan admitted she was not present for any of the conversations between the victim and the State, and therefore, did not have first-hand knowledge of an alleged offer. She acknowledged she spoke with counsel several times during the trial but did not attempt to ask him about the plea offer again. Ms. Buchanan said the petitioner told her that he had tried to talk to counsel about the plea offer, but counsel did not elaborate on the offer just saying it was not a good deal.

Danielle Nellis, the lead prosecutor, described the case as a "very victim-forward prosecution" because of the continued relationship between the victim and the petitioner and the victim's desire for the petitioner not to go "away for the rest of his life." To her recollection, Ms. Nellis verbally conveyed an offer to counsel at the last status hearing

---

[1] The reason for the subsequent hearing was to allow the prosecutor at trial, who was no longer an employee of the district attorney's office, to review the State's file in order to refresh her memory regarding plea negotiations and then provide further clarification with her testimony.

before trial. She said the offer was "not a firm offer" but instead "was a suggestion of an amount of time" and the details would have been worked out later. Ms. Nellis stated any offer would have been approved by or at least discussed with the victim. Without remembering the details, Ms. Nellis believed the victim wanted the petitioner to serve two to five years in custody and "then have some kind of lengthy probation." She noted the victim "had no desire for [the petitioner] to be out immediately" on time-served; "she absolutely wanted him to be held accountable for his actions" by "continu[ing] to serve some jail time." Ms. Nellis recalled the morning of trial it was brought to her attention some of the petitioner's family members were concerned about whether counsel had conveyed an offer to the petitioner, and counsel was, therefore, asked to confirm on the record he had conveyed all plea offers to the petitioner.

The victim testified the petitioner was the father of her three children. She recalled putting money on the petitioner's books at the beginning of his incarceration in order for them to talk on the phone. She said they also possibly participated in three-way phone conversations but could not specifically recall any of those, including one with the petitioner's mother. The victim remembered the prosecutor, Ms. Nellis, asking her how she would feel if the State offered the petitioner a ten-year sentence at thirty percent. The victim told Ms. Nellis she hoped the petitioner would take the offer because she did not want to go to trial.

The victim discussed the plea deal mentioned by Ms. Nellis with the petitioner over the phone. She told the petitioner he should take the offer, but the petitioner indicated no one had given him such an offer. A period of days or weeks later, the petitioner asked her about the offer again, and she told him what Ms. Nellis had said. The victim recalled Ms. Nellis later informed her that the petitioner had rejected the offer they discussed. When she confronted the petitioner about why he did not take the offer, the petitioner told her the plea offer she described was never conveyed to him. The victim recalled these conversations took place several months before trial. She acknowledged she had no way of knowing whether the petitioner was being truthful with her about his not being conveyed the offer.

The petitioner testified he had a three-way phone call with his mother and the victim the night before trial. During the call, the victim told him about a plea deal in which he would spend four years in custody, two of which he had already served awaiting trial, and would involve local incarceration instead of service in the penitentiary. The victim encouraged him to take the deal by referring to her having served a five-year-sentence, and the petitioner told her, "yeah, I'm fixing to go with that."

The petitioner recalled that up until this point he had only been offered an eighteen-year-sentence early on and, about six months prior to trial, a ten-year-sentence. When the

petitioner asked counsel "what percentage" he would have to serve of the ten-year-sentence, counsel "acted like he didn't know[.]" However, knowing the charges he was facing, the petitioner believed he would have to serve eighty-five percent.

The morning of trial, the petitioner asked counsel about the supposed third offer described by the victim the night before, but counsel "said it didn't exist" and to "leave [him] alone, I've got to get ready for trial." Counsel told the petitioner the State's offer remained at ten years, and the petitioner said, "I can't do no ten." Counsel did not tell him any stipulations or specifics regarding service of the ten years. The petitioner did not ask counsel specifically about the offer mentioned by the victim because he had been admonished by the trial court about communicating with the victim and did not want counsel to know they had been talking. Instead, the petitioner wrote the details of the offer on a piece of paper and told counsel to see if the State would accept it. The petitioner did not think he and counsel were talking about the same offer and had counsel told him the stipulations of the ten-year offer, he would have taken it.

On cross-examination, the petitioner clarified the offer the victim told him about was "four to do, six to do on paper[,]" for a total of ten years. Asked if he declined such offer, the petitioner said, "No, I didn't decline it. [Counsel] didn't tell me the stipulations to it." The petitioner admitted counsel told him the offer was "ten," but again complained counsel did not explain the "stipulations." The petitioner acknowledged he committed the acts of which he was convicted.

The petitioner's trial counsel testified he was an attorney with thirty-one years' experience, primarily in criminal defense, and he was retained to represent the petitioner approximately thirteen months before the case ultimately went to trial. Counsel received discovery and "[e]xtensively" reviewed it with the petitioner. He and the petitioner met "[m]any times" throughout the pendency of trial.

Counsel said it was his practice to take contemporaneous notes throughout the course of a representation, and he relied on his notes at various times while testifying. Referring to his notes, counsel recalled the State extended an offer to the petitioner via email on July 12, 2016. The first offer required the petitioner to plead guilty to kidnapping in count 1, rape in count 2, aggravated assault in count 4, and felon in possession of a weapon in count 5, for an effective sentence of eighteen to twenty-six years' incarceration. Counsel discussed the offer with the petitioner, and he rejected it outright. Counsel had in his notes that "the rape charge was extremely important in any plea . . . for [the petitioner]," elaborating the petitioner "rejected that he ever raped [the victim] and would not . . . accept a rape charge or conviction in any plea."

Counsel testified the State verbally extended a second offer on February 2, 2017, at the courthouse on a status hearing. The offer was for ten years, subject to a sentencing hearing, and involved the petitioner pleading guilty to kidnapping in count 1, rape in count 2, and felon in possession of a weapon in count 5. Counsel had in his notes "all three of those charges were extremely important to General Nellis." The petitioner asked counsel to call his mother, Ms. Buchanan, to discuss the offer, and Ms. Buchanan told counsel the victim wanted to talk to him as well. Counsel called the victim, and his notes indicated "she does not oppose aggravated assault, probation and split." However, the petitioner rejected the offer because it required a guilty to plea to rape, and the petitioner maintained "there had never been penetration."

Counsel said the State never made any plea offers that did not include a rape conviction. He recalled that he and Ms. Nellis had "some vague talk . . . about two more years roughly to serve . . . [but] it still entailed a rape conviction." Counsel maintained he conveyed to and discussed every offer made by the State with the petitioner.

Ms. Nellis was recalled to testify after she had a chance to review the State's file. Ms. Nellis stated she made an offer to the petitioner at a status hearing on February 2. There was a note in her file indicating counts 1, 2, and 5 were "sticking points," count 2 being the aggravated rape charge. Ms. Nellis recalled the victim wanted the petitioner to serve four or five years, but she also wanted him to be held accountable for the rape and the petitioner "was unwilling to plead to the rape charge." Ms. Nellis reiterated, "He needs to be accountable for the rape, and we were not able to move beyond the count to reach any particular agreement."

The post-conviction court denied the petition, finding the petitioner failed to prove his factual allegations by clear and convincing evidence. The court recounted the petitioner's claim that he rejected the State's offer of ten years because counsel failed to specify the percentage of the sentence he would have to serve or any "stipulations" regarding the ten years, and he would have accepted the State's offer had counsel explained to him the "ten years" would involve his serving four years in custody and six years on probation. However, the court determined the evidence did not support that such an offer was ever made. The court noted counsel and Ms. Nellis both denied the existence of a formal offer as described by the petitioner. The court observed Ms. Nellis and counsel might have explored hypothetical scenarios in an attempt to reach a plea agreement but those "discussions are not tantamount to an offer . . . [c]ounsel is duty bound to convey." The court further found that even if an offer were conveyed to the petitioner as he described, he would have rejected such offer because the unrefuted testimony indicated "any agreement requiring a plea to the rape charge was a deal breaker." The court concluded the "[p]etitioner rejected the State's offers because he refused to plead guilty to [r]ape – not because [t]rial [c]ounsel rendered ineffective assistance."

*Analysis*

On appeal, the petitioner challenges the post-conviction court's failure to find he received ineffective assistance of counsel. The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is de novo, with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations de novo, affording a presumption of correctness only to the post-conviction court's findings of fact. *Id.*; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id.* Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.*; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

To determine whether a petitioner is entitled to relief for ineffective assistance of counsel during plea negotiations, the petitioner has the burden of showing by a reasonable probability that, but for counsel's deficient representation, (1) the petitioner would have accepted the plea, (2) the prosecution would not have withdrawn the offer, and (3) the trial court would have accepted the terms of the offer, such that the penalty under its terms would have been less severe than the penalty actually imposed. *Nesbit v. State*, 452 S.W.3d 779, 800-01 (Tenn. 2014).

The petitioner asserts he did not understand the ten-year offer conveyed to him by counsel would result in his only serving four or five years in custody like the "offer" mentioned to him by the victim, and he would have taken the offer had he understood "the details." He claims counsel was ineffective for failing "to convey to [him] the details of what his plea offer would actually entail in the way of time served in custody."

We initially note the petitioner's argument on appeal differs from his argument in the court below in that, in the court below, he at times seemed to suggest there was a third offer made by the State of which counsel did not apprise him but on appeal alleges counsel just did not fully explain the second offer. Regardless of how we view the petitioner's claim, we determine he did not receive ineffective assistance of counsel.

The testimony at the evidentiary hearing shows the last offer made by the State was for ten years and involved a guilty to plea to the charge of rape. Counsel testified he conveyed to and discussed every offer made by the State with the petitioner, and the State never made an offer that did not include a rape conviction. Counsel recalled he and Ms. Nellis had "some vague talk . . . about two more years roughly to serve . . . [but] it still entailed a rape conviction." According to counsel, the petitioner rejected any offer requiring a guilty to plea to rape because he maintained "there had never been penetration."

Ms. Nellis testified the rape charge was a "sticking point"; the victim did not want the petitioner to be incarcerated for a long time but wanted him held accountable for the rape. However, the petitioner "was unwilling to plead to the rape charge." Ms. Nellis said, "[W]e were not able to move beyond the count to reach any particular agreement."

The post-conviction court accredited the testimonies of counsel and Ms. Nellis, finding, "The attorneys were clear in their testimony, which was not refuted by the [p]etitioner, that any agreement requiring a plea to the rape charge was a deal breaker." The court summarized, "[T]he State would not accept an agreement without a plea to the rape charge and the [p]etitioner would not accept a plea that included the rape charge. . . . [The] [p]etitioner rejected the State's offers because he refused to plead guilty to [r]ape – not because [t]rial [c]ounsel rendered ineffective assistance." The record supports the post-conviction court's determinations. We conclude the petitioner has failed to prove any deficiency in counsel's performance and, even assuming deficient performance, he has failed to prove he would have accepted a plea requiring him to plead guilty to rape.

### *Conclusion*

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE

- 9 -