IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 13, 2022

## JACOB SCOTT HUGHES v. STATE OF TENNNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2013-A-43        Mark J. Fishburn, Judge**

_____

## No. M2022-00186-CCA-R3-PC

_____

The Petitioner-Appellant, Jacob Scott Hughes, appeals from the denial of his petition seeking post-conviction relief from his convictions of first-degree felony murder and aggravated child abuse, for which he was sentenced, respectively, to life and twenty-five years' imprisonment, to be served consecutively, as a result of the death of the sixteen-month-old daughter of his girlfriend. State v. Jacob Scott Hughes, No. M2016-01222-CCA-R3-CD, 2017 WL 3724457, at *1 (Tenn. Crim. App. Aug. 29, 2017), no perm. app. filed. In this appeal, the Petitioner argues that he was denied effective assistance of counsel based on trial counsel's failure to pursue plea negotiations, failure to obtain a forensic pathologist to provide expert testimony, and failure to prevent a reference to the phrase, "Hammer Skin" during trial. [1] Upon our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which TIMOTHY L. EASTER and JILL BARTEE AYERS, JJ., joined.

Wesley Clark, Nashville, Tennessee, for the Petitioner-Appellant, Jacob Scott Hughes.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Janice Norman, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

---

[1] The Petitioner raised several other issues in his post-conviction petition and at the post-conviction hearing, all of which we deem to be waived. We further note that "Hammer Skin" is referenced inconsistently throughout the record as "Hammer Skin," "Hammer Skins," and "Hammerskins." We will use "Hammer Skin," consistently with this Court's direct appeal opinion.

On the morning of the sixteen-month-old victim's death, the Petitioner drove the victim's mother to work, with the victim in her car seat. Jacob Scott Hughes, 2017 WL 3724457, at *1. Upon their arrival, a co-worker of the victim's mother spoke with the victim in the car "for just a minute" and observed the victim to be "happy and dancing" to a song on the car radio. Id. There were no visible injuries to the victim at that time. Later that afternoon, paramedics responded to the victim's home, observed that the victim had extensive injuries, and she was taken to the hospital. The victim died shortly thereafter of extensive injuries, which will be discussed in detail below. The Petitioner claimed that the victim's death was accidental. He told the victim's mother's co-worker that "because the victim had 'black tarry stools,' he had put her in the bathtub to clean her, and when he returned from getting some bleach, the victim had fallen between the bathtub and the toilet." Id. The Petitioner repeated a similar version of his account of the events that morning while at the hospital and explained that "he put the victim in the bathtub after she had vomited and 'pooped brown stuff.'" He then "left her alone while he went to get something to clean her up and found her as she was when the paramedics arrived." Id.

The facts underlying the Petitioner's convictions as outlined in this court's opinion on direct appeal pertinent to the issues raised herein are as follows:

[Dr. Deborah Lowen's, the Director of the Center for Child Protection and Well-Being at the Vanderbilt University School of Medicine], examination of the victim revealed a broken bone to the right side of her skull, a subdural hematoma, and swelling of her brain. Tests performed on the victim showed "significant brain injury, throughout the brain, all parts of the brain" and swelling to the back of her eyes. The victim had "massive amounts of bilateral retinal hemorrhages, bleeding in the very back of her eyes, both sides, with areas of retinal detachment," and multiple bruises. Based upon the injuries, Dr. Lowen concluded that the victim "had been a victim of child physical abuse and abusive head trauma," which was "nonaccidental." As to whether all of the victim's injuries could have been caused by her falling from a bathtub, Dr. Lowen responded, "[A]bsolutely not." She said that while a fall from a bathtub could result in a skull fracture, it "would not explain all the different sites of impact on [the victim's] head or the subdural or the retinal hemorrhage and retinoschisis and the bruises everywhere." Dr. Lowen said that the victim would have been "symptomatic immediately after suffering" the head trauma and would not have been able to sing or appear happy. Further, none of the victim's injuries could have resulted from CPR, as the Defendant claimed to have performed on her, and any delay in obtaining medical care lessened her chance for survival.

Dr. Adele Lewis testified that she was a forensic pathologist, the Tennessee Interim State Chief Medical Examiner, and the Deputy Chief Medical Examiner for Metro Nashville Davidson County. She said that she performed the autopsy on the sixteen-month-old victim who weighed about twenty pounds at the time of her death, which was the result of multiple blunt force injuries. Dr. Lewis detailed the injuries sustained by the victim:

> She had many, many bruises and scrapes of her head and of her face. She had bleeding underneath her scalp, as well as underneath her skull and on her brain. She had bleeding all around her spinal cord. She had injuries to her brain itself, her brain was very swollen and soft. She had a skull fracture and a broken bone in her skull. She had some bleeding in the back of her neck right where your neck kind of attaches to your head.... She also had multiple bruises of her chest, abdomen, back and buttocks and genitalia and also multiple bruises to her arms and legs. She had a bite mark on her left lower leg.

Dr. Lewis explained why there was "no question" that the victim had been beaten to death:

> [T]here's definitely evidence that she was beaten, with the bruising that we see on the outside of the body, you don't get a big bruise on your face from being shaken. You don't get a bite mark on your leg being shaken. So those are specific injuries that tell me that there definitely was some kind of impact or her body striking an object or an object striking her body.

Dr. Lewis further testified that there were five or six separate impacts to the victim's head, which could not have resulted from a fall.

. . . .

Detective Chad Gish of the [Metro Nashville Police Department], accepted by the trial court as an expert in computer and mobile device forensic analysis, testified that Detective Bruner contacted him on July 9, 2012, regarding the Facebook messages. After Ms. Costanza gave Detective Gish her identification and password, he logged in to her live Facebook account and obtained messages exchanged on July 8, 2012, between her and the Defendant, as well as messages between the Defendant and a friend of his, Mark Denton. Detective Gish verified that the printed copy of the Facebook

- 3 -

messages were the same messages as those on the live account and took screenshot photographs of the messages, which were admitted into evidence. The Defendant sent Mr. Denton a message at 12:33 p.m., saying, "I'm headed over to the Hammer Skin hangout house here in a few, if you want to come with," and another message at 12:52 p.m., saying, "You bring the smoke, I got some percs 7.5 too."

Jacob Scott Hughes, 2017 WL 3724457, at *2-3.

This court affirmed the Petitioner's convictions on direct appeal, and there was no application for permission to appeal to the Tennessee Supreme Court. On February 26, 2018, the Petitioner filed a pro se petition seeking post-conviction relief, and the post-conviction court appointed counsel shortly thereafter. Appointed counsel filed an amended petition incorporating the issues raised in the Petitioner's pro se petition and the matter was set for an evidentiary hearing on November 18, 2021.

At the post-conviction evidentiary hearing, the Petitioner testified that he recalled the testimony of Dr. Lowen during his trial. Specifically, he recalled that she discussed the injuries to the victim including "more than thirty-five bruises . . . . a skull fracture [and] subdural hematoma." The Petitioner said that trial counsel had not discussed the medical testimony with him prior to trial and that he was "surprised" by Dr. Lowen's testimony because it was the first time that he had heard medical evidence of the victim's injuries. The Petitioner also said that he was surprised to hear Dr. Lowen testify that the victim's death could not have been the result of a fall. The Petitioner testified that trial counsel never discussed getting an expert to refute the expert testimony of Dr. Lowen and Dr. Lewis. The Petitioner was particularly aggrieved because trial counsel did not provide him with an alternative trial strategy based on the expert testimony of Dr. Lowen. The Petitioner agreed that he was shown "the exhibits to the testimonies of the doctors for the State," prior to trial. He explained these were part of the discussion to redact some of the photographs, which were graphic. In other words, the Petitioner agreed that he saw all of the photographs of the victim prior to trial and was not surprised by their admission in evidence.

The Petitioner said he did not testify at trial because he had an "open" domestic violence charge, and he was advised that it would be unfavorable to do so. The Petitioner testified that much of his pretrial preparation was spent on two different self-mental health evaluations. He said trial counsel "never" discussed pre-trial plea negotiations. The Petitioner also believed that trial counsel should have interviewed his co-defendant, Nina Costanza, the victim's mother. The Petitioner theorized that "[m]aybe possibly something . . . happened prior to [him] being awoke that morning because [he] was the last person …

- 4 -

in the whole apartment." The Petitioner denied working with a private investigator in this case.

The Petitioner was also aggrieved because trial counsel failed to adequately address the State's reference to "Hammer Skin" at trial. The Petitioner said because the majority of the jurors in his case were African American, he believed that he was "prejudice[ed]" by the reference in the Facebook messages to "Hammer Skin," an organization, according to him, which was "a well-known violent neo-Nazi skinhead group." The Petitioner was asked about multiple tattoos on his hands and body; but he agreed that none of them were visible during his trial.

On cross-examination, the Petitioner agreed that he was aware prior to trial that Dr. Lowen was a doctor at Vanderbilt University in the Children's Hospital. His complaint centered on the fact that he was unaware of her status as an expert in child abuse. He also agreed that trial counsel reviewed "some" of Dr. Lowen's reports prior to trial.

Trial counsel testified that the Office of the Public Defender had handled the Petitioner's case prior to him being retained to represent the Petitioner. Trial counsel said a motion to sever the co-defendant, the victim's mother, had already been granted and that she was represented by another attorney. Although trial counsel attempted to talk with the co-defendant, her attorney declined to allow it and insisted on keeping the cases separate.

Trial counsel investigated and interviewed other medical experts to counter the expert testimony of Drs. Lowen and Lewis. Trial counsel said "none of them could give him an explanation . . . as to anything other than" the explanation provided by the State's experts, except Dr. Kenner. Trial counsel explained that Dr. Kenner agreed to work with him and was present during the Petitioner's trial. While trial counsel did not tell the Petitioner explicitly that none of the experts interviewed agreed to help him, trial counsel said the Petitioner was aware that trial counsel was seeking out medical experts to challenge the State's experts in his case.

Asked if he pursued plea negotiations on behalf of the Petitioner prior to the trial, trial counsel said that although there were "some discussions," the prosecutrix "never made me an offer." He described the discussions as the State telling him that he could "make [her] an offer of fifty years or something, but . . . none of that was attractive" to the Petitioner. Trial counsel intimated that a formal offer was never extended by the State because, based on the evidence, "there was no reason for the State to make an offer quite frankly."

Asked if he believed he did a "reasonable job in evaluating and pursuing a plea" for the Petitioner, trial counsel replied:

Let me explain something to you. There is nothing I would have enjoyed more than reaching an agreement in this case and not having to try the thing, okay. Nobody wanted to try this case the way it was positioned and with the amount of evidence there was. So[,] if there was any possibility of there being a plea or something that [the Petitioner] would have accepted, I absolutely would have done that, but that wasn't on the table.

On cross-examination and further questioning by the post-conviction court, trial counsel explained that he had plea discussions with the Petitioner but there was no offer the Petitioner was willing to accept. Trial counsel said the charges in the instant case were too "serious," there was no middle ground, and the Petitioner maintained his innocence throughout the proceedings. He confirmed that neither prosecutor assigned to the case was interested in plea negotiations. Trial counsel interviewed five or six potential experts he obtained from the Tennessee Association of Criminal Defense Lawyers (TACDL) and National Association of Criminal Defense Lawyers (NACDL) databases. He provided each potential expert with the casefile to review, and none of them were willing to disagree with or testify against the State's expert witnesses.

Trial counsel was not asked about the reference to "Hammer Skin" at trial.

On February 7, 2022, the post-conviction court entered a written order denying relief and determined that the Petitioner failed to establish through clear and convincing evidence that trial counsel was ineffective. The Petitioner filed a timely notice of appeal, and this case is now properly before this court for review.

## ANALYSIS

The Petitioner argues trial counsel was ineffective in failing to pursue plea negotiations, in failing to obtain a forensic pathologist to provide expert testimony, and in failing to prevent the introduction of the "Hammer Skin" reference at trial. In response, the State contends, and we agree, that the post-conviction court properly denied relief.

In review of these issues, we apply the following well-established legal framework. Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgment of a constitutional right. Tenn. Code Ann. § 40-30-103. A post-conviction petitioner has the burden of proving his or her factual allegations by clear and convincing evidence. Id. § 40-30-110(f); see Tenn. Sup. Ct. R. 28, § 8(D)(1); Nesbit v. State, 452 S.W.3d 779, 786 (Tenn. 2014). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555,

562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

This court reviews "a post-conviction court's conclusions of law, decisions involving mixed questions of law and fact, and its application of law to its factual findings de novo without a presumption of correctness." Whitehead v. State, 402 S.W.3d 615, 621 (Tenn. 2013) (citing Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011); Calvert v. State, 342 S.W.3d 477, 485 (Tenn. 2011)). However, a post-conviction court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. Calvert, 342 S.W.3d at 485 (citing Grindstaff, 297 S.W.3d at 216; State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)). As a result, "appellate courts are not free to re-weigh or re-evaluate the evidence, nor are they free to substitute their own inferences for those drawn by the post-conviction court." Whitehead, 402 S.W.3d at 621 (citing State v. Honeycutt, 54 S.W.3d 762, 766 (Tenn. 2001)). "As a general matter, appellate courts must defer to a post-conviction court's findings with regard to witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence." Id. (citing Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999)).

The right to effective assistance of counsel is protected by both the United States Constitution and the Tennessee Constitution. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. A claim for post-conviction relief based on alleged ineffective assistance of counsel is a mixed question of law and fact. Moore v. State, 485 S.W.3d 411, 419 (Tenn. 2016); Mobley v. State, 397 S.W.3d 70, 80 (Tenn. 2013) (citing Calvert, 342 S.W.3d at 485).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) this deficient performance prejudiced the defense. Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996); Strickland v. Washington, 466 U.S. 668, 687 (1984). A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell "below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad, 938 S.W.2d at 370.

The Petitioner first argues that trial counsel was ineffective in failing to pursue or relay plea negotiations with him prior to trial. A criminal defendant is entitled to the effective assistance of counsel throughout the plea negotiation process. See Harris v. State, 875 S.W.2d 662, 666 (Tenn. 1994); see also Hill v. Lockhart, 474 U.S. 52, 57 (1985) (applying the two-part Strickland test to claims of ineffective assistance of counsel during plea negotiations). "[A]s a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." Missouri v. Frye, 566 U.S. 134, 145 (2012); James McKinley Cunningham v. State, No. M2017-00348-CCA-R3-PC, 2017 WL 5713037, at *5 (Tenn. Crim. App. Nov. 28, 2017). A defendant claiming that trial counsel's performance was deficient in the plea negotiations process has the burden to show by a reasonable probability that, but for counsel's deficient representation, (1) the defendant would have accepted the plea, (2) the prosecution would not have withdrawn the offer, and (3) the trial court would have accepted the terms of the offer, such that the penalty under its terms would have been less severe than the penalty actually imposed. Nesbit v. State, 452 S.W.3d 779, 800-01 (Tenn. 2014) (citing Lafler v. Cooper, 566 U.S. 156, 163 (2012)). The post-conviction court accredited the testimony of trial counsel who testified that there was no plea agreement available in this case. Trial counsel desired a plea agreement; however, this was "moot" because the State would only accept an "open plea" from the Petitioner. Trial counsel further testified that the State did not convey any offers and that the Petitioner was unwilling to accept an offer because he maintained his innocence throughout the proceedings. The record fully supports the determination of the post-conviction court. The Petitioner failed to establish that there was an offer from the State and, even had one been extended, that he would have accepted it prior to trial. Accordingly, the Petitioner is not entitled to relief.

The Petitioner next argues that trial counsel was ineffective in failing to obtain a medical expert to refute the testimony of Drs. Lowen and Lewis. The post-conviction court determined that trial counsel consulted with multiple medical experts to develop alternative theories as to the victim's injuries. None of the experts disputed the findings of Drs. Lowen and Lewis, and none of the experts consulted were willing to aid in the Petitioner's defense. The post-conviction court also determined that the Petitioner failed to produce a medical expert at the post-conviction hearing in support of the Petitioner's accidental death theory of defense. See Black v. State, 794 S.W.2d 753, 757 (Tenn. Crim. App. 1990). Upon our review, we agree with the post-conviction court, and conclude that the Petitioner is not entitled to relief.

Finally, the Petitioner claims ineffective assistance of counsel based on trial counsel's failure to exclude a reference to the phrase "Hammer Skin" which was included in his Facebook messages. On direct appeal, the Petitioner argued that the trial court erred in not redacting from his Facebook message a racial slur, "Hammer Skin" which previously

had been ruled inadmissible.  <u>State v. Jacob Scott Hughes</u>, 2017 WL 3724457, at *4.  Trial counsel had, in fact, successfully moved in limine to exclude the Petitioner's affiliation, if any, with the "Hammer Skins," and "any other gang or racial organization, or any affiliation with members of such groups."  However, while the lead prosecutor who was aware of the motion in limine was absent from the courtroom, the Petitioner's Facebook reference to "Hammer Skin" was admitted into evidence.  Trial counsel was unsuccessful in moving to redact the reference.  The Petitioner argued, much as he does now, that the "Hammer Skins" are "violent and [the] best-organized neo-Nazi skinhead group in the United States."  This court noted that there was simply no evidence regarding this designation and that it was not clear from the message that the reference is not to a person named "Hammer Skin."  In any case, this court determined that the error in admitting the Facebook reference was harmless given the overwhelming evidence of the Petitioner's guilt.  Because the Petitioner has failed to establish deficient performance or prejudice to his defense, he is not entitled to relief.

The Petitioner also contends that he is entitled to relief based on the cumulative effect of trial counsel's errors.  We have determined that none of the Petitioner's claims merit relief; thus, we need not address this issue.

## <u>CONCLUSION</u>

The judgment of the post-conviction court is affirmed.

_____

CAMILLE R. MCMULLEN, JUDGE

- 9 -