IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 2, 2025

**CRAIG TAYLOR v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Madison County**
**No. C-19-276        Kyle C. Atkins, Judge**

_____

**No. W2024-01712-CCA-R3-PC**

_____

The Petitioner, Craig Taylor, appeals the denial of post-conviction relief from his Madison County convictions for first degree premeditated murder, attempted aggravated burglary, two counts of first degree felony murder, and two counts of attempted aggravated robbery, for which he received a total effective sentence of life plus eight years. The Petitioner contends that he was denied the effective assistance of counsel based upon trial counsel's failure to call expert witnesses to rebut the State's experts. After review, we affirm the judgment of the post-conviction court.

**Tenn R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, P.J., and JILL BARTEE AYERS, J., joined.

Samuel W. Hinson, Lexington, Tennessee, for the appellant, Craig Taylor.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Joshua R. Gilbert, Assistant Attorney General (*pro hac vice*); Jody S. Pickens, District Attorney General; and Shaun Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

A full recitation of the facts supporting the Petitioner's convictions may be found in this Court's direct appeal opinion at State v. Taylor, No. W2018-00242-CCA-R3-CD, 2019 WL 1435126 (Tenn. Crim. App. Mar. 29, 2019). As relevant to the issue raised in this appeal, the evidence at the Petitioner's trial established the following:

On November 15, 2012, Pharrah Smartt was in the process of retrieving her infant son from her car parked outside the Jackson home she shared with her boyfriend, Devon Staten, when a masked gunman approached and attempted to force her into the house with him. She reacted by screaming and falling to the ground, and Mr. Staten, who was inside the house, reacted to her screams by coming to her aid armed with his 9-millimeter pistol. Mr. Staten was shot and killed during the ensuing exchange of gunfire between him and the masked gunman and his armed accomplice. The [Petitioner] was developed as a suspect based on a witness's statement that he was at the scene near the time of the shooting, and his DNA and palm print were later found to match, respectively, the DNA obtained from a mask found at the crime scene and a latent palm print found on the air conditioning unit outside the home.

. . . .

In January 2014, the [Petitioner] was finally located in Ripley, Tennessee, and Sergeant Thompson and Investigator Aubrey Richardson interviewed him there. The [Petitioner] denied any knowledge of the 2012 Jackson shooting but admitted that he had sustained a gunshot wound and took off his shoe to show the investigators where he had been shot in the foot. The [Petitioner] told the investigators that his cousin from Chicago had shot him approximately two years earlier and that he had let the wound heal on its own without going to the hospital. The [Petitioner] would not provide the name of the cousin but consented to giving a buccal swab. When the DNA results came back showing the [Petitioner] to be a match to the DNA found on the mask, Sergeant Thompson obtained a search warrant for the [Petitioner's] palm print, which was found to match a palm print that had been found on an air conditioner at the crime scene.

On cross-examination, Sergeant Thompson acknowledged that shell casings from three different weapons were found at the scene: the murdered victim's 9-millimeter, a .45-caliber, and a .40-caliber. He said he spoke at the scene with Mr. Staten's cousin, Kenneth Deberry, who informed him he had been playing video games with Mr. Staten all day but had left and was at home at his nearby residence when he heard gunshots and ran outside. During that initial interview, Mr. Deberry also reported that he had seen the [Petitioner] in the area. Sergeant Thompson testified that he went to "great lengths" in his efforts to locate the [Petitioner], including searching utility records to try to locate his mother's residence and talking to neighbors on the street. He said Ms. Smartt described her assailant as dressed in dark clothing and a

camouflage mask. She also provided a physical description of his body that matched the [Petitioner's] body type and height. To his knowledge, she only identified one assailant.

. . . .

Aimee Oxley, director of the property and evidence unit of the Jackson Police Department and an expert in latent print analysis, identified, among other things: a 9-millimeter pistol that was found on the kitchen floor inside Mr. Staten's home, seven 9-millimeter shell casings that were found on the front porch stoop and inside the kitchen near the back door; a 9-millimeter bullet fragment that was found in the back yard; five .45-caliber shell casings that were found in the street and in the front yard of the house; two .40-caliber shell casings that were found on either side of the home's driveway; a spent projectile recovered from the passenger-side front visor of a car parked on the street; and a camouflage mask that was found in the backyard near the tree line close to the spent 9-millimeter bullet. She said she was able to lift five latent prints from the air conditioner outside the home, but only two of them had sufficient ridge detail to be useful for identification purpose[s]. She later identified one of the latent palm prints from the air conditioner as the [Petitioners'] left palm print.

On cross-examination, she testified that the mask was found on top of some bushes at the tree line in the backyard of the home and that there was no way to determine how long it had been there. She acknowledged that the second latent palm print found on the air conditioner was not the [Petitioner's]. She further acknowledged that she was unable to find any blood trail leading from the area, despite her search. On redirect examination, she testified that, from the trajectory, it appeared as if the spent 9-millimeter projectile found in the back yard had been fired from the back door area of the home.

State v. Taylor, 2019 WL 1435126, at *1-3.

In addition to the above proof, the State offered the testimony of two expert witnesses at trial. An expert in ballistics testified that all seven 9-millimeter cartridge cases and the 9-millimeter bullet jacket, or piece of a bullet, came from the 9-millimeter weapon that was submitted for analysis. She said all five .45 auto caliber cartridge cases came from the same unknown .45 auto caliber pistol, and the two .40-caliber cartridge cases were fired from the same unknown .40-caliber pistol. The spent projectile recovered from the car's front visor was identified as a .45-caliber bullet, but she was unable to determine if it came from the same weapon as

- 3 -

the .45-caliber casings because she did not have the weapon for comparison.  An expert in serology and DNA analysis testified that he compared the DNA found on the mask to the DNA profile of the Petitioner and confirmed that the Petitioner was a major contributor to a mixture of DNA found on the nose and mouth portion of the mask.  The expert noted that the "probability of randomly selecting an unrelated individual with the same DNA profile [was] one in a number greater than the current world population[.]"  On cross-examination, he acknowledged that the fact that the Petitioner's DNA was on the mask did not necessarily mean that the Petitioner ever wore the mask.  Taylor, 2019 WL 1435126, at *4.

Three of the Petitioner's family members testified on his behalf at trial.  The Petitioner's stepfather testified that the Petitioner was with him on the day of the offense; however, the Petitioner was not in his "visual sight" when he heard gunshots.  The Petitioner's younger brother testified that he and the Petitioner formerly spent a lot of time in the area where the shooting occurred playing in the woods and riding four-wheelers over the area trails.  The Petitioner's mother testified in pertinent part that the Petitioner formerly lived in the area where the shooting occurred and frequently wore a face mask during his four-wheeler rides to prevent getting scratched by tree branches.  Id. at *5.

Following his convictions, the Petitioner filed a direct appeal and argued that the evidence was insufficient to sustain his convictions and that "the trial court committed reversible error by excluding proposed witness testimony on the erroneous basis that it constituted alibi testimony for which the State had not received prior notice."  Id.  This court affirmed the trial court's judgments.  Id. at *6.

**Post-Conviction.**  On October 31, 2019, the Petitioner filed a handwritten pro se petition for post-conviction relief, alleging seventeen grounds of ineffective assistance of counsel, six prosecutorial misconduct claims, and a claim alleging violations of double jeopardy.  As relevant to the issues raised on appeal, the Petitioner's pro se petition specifically alleged (1) that trial counsel was ineffective "in failing to file of motion of suppression" as to the victim's cousin, a State witness; (2) trial counsel was ineffective "in failing to suppress the DNA saliva swab of the Petitioner . . . in violation of the Petitioner's Fifth Amendment Rights against illegal search and seizure" because he was forced to provide a saliva swab to detectives; and  (3) that trial counsel was ineffective in failing "to call key witness[es] that could have proved the Petitioner did not commit the crime."  The post-conviction court appointed counsel, and on February 10, 2020, the Petitioner filed an amended petition incorporating all grounds alleged in his pro se petition.  In addition, the Petitioner alleged that trial counsel was ineffective in communicating with the Petitioner because trial counsel (1) failed to call "several necessary witnesses including his brother,

mother, and step-father" as instructed by the Petitioner and (2) failed to file a motion to suppress the "illegally obtained DNA evidence" after counsel filed said motion but did not appear at the hearing and declined to pursue the motion on the morning of trial. The Petitioner asserted that trial counsel did not articulate why he abandoned the motion to suppress and that this was done without the Petitioner's authorization. The State filed a written motion denying the allegations contained in the petition.

At the October 22, 2024 post-conviction hearing, the Petitioner presented testimony from Samantha Spencer and trial counsel. Samantha Spencer, an expert in serology and DNA analysis and former Tennessee Bureau of Investigation ("TBI") forensic scientist, testified that she reviewed two lab reports on the DNA testing completed on the face mask found at the scene. The first lab report, conducted in January of 2013, showed that the face mask was submitted for testing along with a saliva standard from another potential suspect. Spencer noted that this report stated that "the DNA profile is consistent with a mixture of genetic material[,]" but did not state the number of contributors for the profile. Spencer explained that, without an indication of how many people are within that mixture of genetic material present on the mask, "the strength of the statistic provided later on is kind of up in the air." The second report, conducted in April of 2014, compared the Petitioner's DNA to the DNA on the face mask. The sample was again identified as a mixture of genetic material, but this time the report stated that the mixture was consistent with two or more individuals and the "major contributor" of DNA "matches" the Petitioner.

Spencer stated that she had "a number of issues with both reports." First, she explained that the use of the word "matches" to describe the Petitioner's DNA in relation to the DNA on the face mask is incorrect because of the uncertainty of how many DNA profiles were present on the face mask. Instead, Spencer asserted that the report should have stated that the Petitioner's DNA was "consistent" with the DNA profile from the face mask. Spencer noted the "stark difference" between the first report, which did not indicate a major contributor of DNA, and the second report which indicated the Petitioner as the major contributor of DNA. Since the first report did not conclude that there was a major contributor of DNA, Spencer opined that, "Instead of looking at the evidentiary piece of evidence, being objective without possible answers and making that conclusion, we're now changing our conclusions because we have. . . a [DNA] standard." Spencer stated that had the first report indicated that there was a major contributor of DNA from an unknown individual, the second report indicating the Petitioner as the major contributor would have been consistent. Nonetheless, Spencer stated that "the idea that two different conclusions were made on the same evidentiary sample is problematic" and should have been disclosed to the jury.

On cross-examination, Spencer maintained that because there is "a conclusion that is different between two different reports on the same DNA profile, then one of them is not

correct." When asked who issued the first and second lab reports, Spencer stated that she believed her supervisor at the time, Agent Lawerence James, issued both reports. Spencer said that, according to TBI practices, both lab reports would have gone through administrative and technical review. She admitted that, although she could not remember if she personally worked on this case while working for TBI, it is possible that she could have been the person who reviewed and approved the reports at the time they were issued. She was also unaware if the jury had been presented with both reports at the Petitioner's trial.

Trial counsel testified that Spencer's testimony regarding DNA analysis was "fundamentally not really much different" than the testimony provided by the State's expert at trial. Trial counsel acknowledged that, during the Petitioner's case-in-chief, he called "one or two" witnesses, neither of whom were experts. On cross-examination, trial counsel noted that the defense trial strategy did not hinge on whether the Petitioner's DNA was on the mask. Trial counsel stated that he was "almost stipulating that [the Petitioner] wore the mask" because it was found in the woods "where [the Petitioner] would have been riding four-wheelers." Trial counsel explained his decision not to call any expert witnesses to testify as follows:

> This is my opinion about expert witnesses. If the State has an expert witness - - and this is from years of experience - - their expert is generally going [to] trump your expert. And we - - I think we saw a little of that this morning. For a jury to sit there and listen to that discourse, they - - I think it does damage.
>
> . . .
>
> Had the ski mask been the sole piece of evidence linking [the Petitioner], then I would have taken a different approach. But like I said, we - - had [the State] asked for a stipulation has he ever worn this mask, I probably would have stipulated to it. It just wasn't - - In the big scheme, it was not that big a factor.

On redirect examination, when asked whether he thought it might be important for the jury to hear a contrary expert opinion after listening to several State expert witness testimonies, trial counsel asserted that the State's experts were "typical experts you see in a homicide." When asked whether he spoke to any experts prior to trial to rebut the State's expert witness's testimony, trial counsel said that he considered potentially having a DNA expert, but "it wasn't a strong part of the case."

In denying relief, the post-conviction court determined that the Petitioner failed to show by clear and convincing evidence that trial counsel's performance was deficient. The court noted that the jury had also heard evidence of a palm print match and testimony from a witness who knew the Petitioner and saw him in the area at the time of the offense. Regarding Spencer's expert DNA analysis testimony, the court stated that although she identified two differing words in the DNA report, "there's nothing disputing the other evidence that was present at the trial." By written order on February 4, 2025, the court repeated its oral findings and denied the petition. Specifically, the court determined that "the Petitioner failed to prove, by clear and convincing evidence, that counsel was deficient in his representation of the Petitioner regarding the DNA analysis in the [Petitioner's] case." The Petitioner filed a timely notice of appeal.

## ANALYSIS

In his statement of the issues in his brief, the Petitioner asserts the post-conviction court "erred when it ruled that [the Petitioner] did not receive ineffective assistance of counsel, when his trial counsel failed to call any defense experts to rebut the State's experts." In his argument section, the Petitioner contends that trial counsel only called two witnesses on behalf of the Petitioner, neither of whom were expert witnesses. In doing so, the Petitioner claims trial counsel was ineffective in failing to "call any meaningful witnesses, specifically expert witnesses, which left the jury with a one-sided view of the [S]tate's evidence." The State responds that the Petitioner waived this issue by not raising it in his initial or amended petition for post-conviction relief and by failing to secure a ruling on it. We agree with the State and conclude that this issue has been waived.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. Id. § 40-30-110(f); see Tenn. Sup. Ct. R. 28, § 8(D)(1); Nesbit v. State, 452 S.W.3d 779, 786 (Tenn. 2014). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

A claim for post-conviction relief based on alleged ineffective assistance of counsel presents a mixed question of law and fact. Mobley v. State, 397 S.W.3d 70, 80 (Tenn. 2013) (citing Calvert v. State, 342 S.W.3d 477, 485 (Tenn. 2011)). This court reviews "a post-conviction court's conclusions of law, decisions involving mixed questions of law and fact, and its application of law to its factual findings de novo without a presumption of correctness." Whitehead v. State, 402 S.W.3d 615, 621 (Tenn. 2013) (citing Felts v. State,

354 S.W.3d 266, 276 (Tenn. 2011); Calvert, 342 S.W.3d at 485). However, a post-conviction court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. Calvert, 342 S.W.3d at 485 (citing Grindstaff, 297 S.W.3d at 216; State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)). "Accordingly, appellate courts are not free to re-weigh or re-evaluate the evidence, nor are they free to substitute their own inferences for those drawn by the post-conviction court." Whitehead, 402 S.W.3d at 621 (citing State v. Honeycutt, 54 S.W.3d 762, 766 (Tenn. 2001)). "As a general matter, appellate courts must defer to a post-conviction court's findings with regard to witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence." Id. (citing Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999)).

The right to effective assistance of counsel is protected by both the United States Constitution and the Tennessee Constitution. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. To prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996); Strickland v. Washington, 466 U.S. 668, 687 (1984). A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell "below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Id.

In assessing an attorney's performance, we "must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462 (citing Strickland, 466 U.S. at 689). In addition, we must avoid the "distorting effects of hindsight" and must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. 689-90. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal Petitioner." Id. at 688-89. However, "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

A post-conviction petitioner generally waives a ground for relief where he or she does not include the ground in the petition. See Tenn. Code Ann. § 40-30-110(c) ("Proof upon the petitioner's claim or claims for relief shall be limited to evidence of the allegations of fact in the petition."); Tenn. Sup. Ct. R. 28, § 8(D)(4) ("The hearing shall be limited to issues raised in the petition."). Tennessee appellate courts may only consider issues that were not formally raised in the post-conviction petition if the issue was argued at the post-conviction hearing and decided by the post-conviction court without objection. Holland v. State, 610 S.W.3d 450, 458 (Tenn. 2020).

In this case, the record does not show that the Petitioner properly preserved this claim for appellate review. First, the Petitioner did not formally raise any claim in his post-conviction petition or his amended petition that he was denied the effective assistance of counsel when trial counsel failed to call any expert witnesses. In his pro se petition, the Petitioner specifically alleged (1) that trial counsel was ineffective "in failing to file of motion of suppression" as to the victim's cousin, a State witness; (2) trial counsel was ineffective "in failing to suppress the DNA saliva swab of the Petitioner . . . in violation of the Petitioner's Fifth Amendment Rights against illegal search and seizure" because he was forced to provide a saliva swab to detectives; and (3) that trial counsel was ineffective in failing "to call key witness that could have proved the Petitioner did not commit the crime." In his amended petition, the Petitioner alleged that trial counsel was ineffective in communicating with the Petitioner because trial counsel (1) failed to call "several necessary witnesses including his brother, mother, and step-father" as instructed by the Petitioner and (2) failed to file a motion to suppress the "illegally obtained DNA evidence" after counsel filed said motion but did not appear at the hearing and declined to pursue the motion on the morning of trial. The Petitioner asserted that trial counsel did not articulate why he abandoned the motion to suppress and that this was done without the Petitioner's authorization.

Although both petitions allege a failure to call key or necessary witnesses, neither specifically asserts a failure to call expert witnesses, nor do they identify any expert witness who should have been presented. In fact, in the Petitioner's petitions, the only argument raised that involved DNA evidence was in the context of seeking suppression based on a search and seizure claim, not a failure to call a DNA expert.

Next, the Petitioner did not secure a ruling on this issue from the post-conviction court. Based on the post-conviction hearing transcript, the Petitioner did not identify whether trial counsel was ineffective in failing to call a DNA expert as an additional claim at the hearing. By failing to do so, the Petitioner failed to place the State and the court on notice of which issues would be addressed at the hearing. Moreover, a fair reading of the proof adduced at the evidentiary hearing can be interpreted to support any of the multiple

claims concerning "key" or "necessary" witnesses alleged within his petition and the amended petition. Although the testimony focused on the DNA reports and analysis, the order of the post-conviction court was general in nature and concluded that "the Petitioner failed to prove, by clear and convincing evidence, that counsel was deficient in his representation of the Petitioner regarding the DNA analysis in the [Petitioner's] case." The post-conviction court's order makes no mention of, nor does it resolve, the Petitioner's claim regarding trial counsel's failure to present a DNA expert. Under these circumstances, we conclude that this issue was not decided by the post-conviction court and is therefore waived.

Waiver notwithstanding, the record shows that trial counsel made a strategic decision not to call a DNA expert witness in this case. Based on his years of experience as a criminal defense attorney, trial counsel believed that calling expert witnesses in this case would have been "damag[ing]" and "confusing" for the jury. More importantly, trial counsel asserted that the DNA found on the face mask "wasn't a strong part of the case." He explained that the Petitioner was not arrested until almost two years after the offense and that the mask with the DNA was found in a separate wooded area. As part of his strategy, trial counsel was willing to stipulate that the Petitioner wore the mask because the Petitioner's family members testified that the Petitioner formerly lived in the area where the offense occurred and often wore a mask to protect his face from tree branches while riding four-wheelers. Trial counsel never "really" argued that the Petitioner did not have the mask on at some point and believed that the face mask was "not a big factor" in the overall case. Additionally, the DNA expert testified at the hearing that she believed the DNA reports were "problematic." She did not state that there was DNA evidence excluding the Petitioner from the instant offense. Finally, as noted by the post-conviction court, "there was other evidence, apart from DNA, to establish the Petitioner's guilt in his case including palm prints and eyewitnesses[.]" Accordingly, the Petitioner has failed to establish deficient performance and resulting prejudice based on trial counsel's failure to call a DNA expert witness. He is not entitled to relief.

## CONCLUSION

Based on the above reasoning and authority, we affirm the judgment of the post-conviction court.

s/ **Camille R. McMullen**
CAMILLE R. MCMULLEN, JUDGE

- 10 -